WOOLRIDGE, Assignee, etc., *v.* McKENNA and others.

*(Circuit Court, W. D. Tennessee. August 22, 1881.)*

1. REMOVAL OF CAUSES—TIME OF FILING TRANSCRIPT—MANDATORY AND DIRECTORY STATUTES—ACT OF MARCH 3, 1875, § 3—18 ST. 470—JURISDICTION—AMENDMENTS—REVISED STATUTES, §§ 948, 954.

    The provision of the act of March 3, 1875, § 3, requiring the transcript of the record of the state court to be filed on the first day of the next succeeding term of the federal court, is not mandatory, as a condition precedent to the jurisdiction of the federal court, but is directory only, as a mode of practice. The statute should be strictly obeyed, but the court, under the Revised Statutes, §§ 948, 954, may, and on good cause shown should, enlarge the time for filing, or cure the defect by allowing the transcript to be filed *nunc pro tunc*.

2. SAME SUBJECT—INFANT DEFENDANT—HOW HIS SUIT MAY BE REMOVED—GUARDIAN—GUARDIAN AD LITEM—NEXT FRIEND—CITIZENSHIP.

    Where the necessary jurisdictional facts exist, an infant defendant may remove his suit into the federal court as any other defendant may, and the petition for removal and bond may be filed in his behalf by his regular guardian, the guardian *ad litem*, or a next friend, as the case may be. The citizenship of the infant determines the jurisdiction, and not the citizenship of the guardian or next friend.

3. SAME SUBJECT—HOW INFANT DEFENDANT IS BROUGHT IN—SERVICE OF PROCESS—SUBSTITUTED PROCESS—PUBLICATION—PRACTICE IN REMOVED CAUSES WHERE THE DEFENDANT IS AN INFANT.

    There is no mode known to the practice of the federal courts in removed causes by which an absent infant defendant can be served with process, or brought into court by substituted process, by publication, or otherwise; and as an infant cannot voluntarily appear or waive process, nor can any one until process served voluntarily appear for him, it is premature for a guardian or next friend to remove the cause until the infant defendant has been, by proper service of process directly, or by substitution, brought into the state court, or until by the state laws some one authorized to enter his appearance has appeared for him in that court. He cannot, nor can any one for him, under the authority of the state laws, appear in the federal court, and his representative must defer the removal until the infant has been properly bound to defend in the state court. *Held, therefore,* where the father of an absent infant defendant appeared in the state court, and, as next friend, filed a petition and bond for a removal before there had been any service of process or publication according to the state laws to bring in the infant, that the cause must be remanded for want of jurisdiction over the person of the infant.

**4.** SAME SUBJECT—VOLUNTARY APPEARANCE OF GUARDIAN—RATIFICATION.

Where the father and next friend of an infant defendant, who had attempted, before service of process, to remove the infant's suit to the federal court upon a petition and bond undertaking to enter his and the infant's appearance in that court, subsequently to the proceedings procured an appointment *as guardian* from the proper state court, and thereupon, as such guardian, entered his and the infant's appearance in the federal court: *held*, that such appearance was ineffectual to give the court jurisdiction of the person of the infant, or to cure by ratification the defective petition and bond for removal, although in the state court the service of process on the guardian would bind the infant, and the guardian might voluntarily appear there for him.

**5.** SAME SUBJECT — CASE ARISING UNDER THE CONSTITUTION AND LAWS OF THE UNITED STATES — JURISDICTION OF SUBJECT-MATTER — BANKRUPTCY — BILL TO SET ASIDE FRAUDULENT CONVEYANCES.

A bill by an assignee in bankruptcy to set aside a fraudulent conveyance by the bankrupt, is a case arising under the constitution and laws of the United States, of which the federal courts have jurisdiction, irrespective of the citizenship of the parties; but where there is an infant defendant seeking a removal, the petition and bond should not be filed until after service of process on the infant, or there be an authorized appearance for him in the state court.

**6.** SAME SUBJECT—PETITION FOR REMOVAL—JURISDICTIONAL AVERMENTS—AMENDMENTS—PRACTICE.

While the court will look to the transcript of the record of the state court in aid of the allegations of the petition for removal, the petition itself must contain the necessary jurisdictional averments; and if it alleges that the parties are citizens of different states as the basis of removal, the petitioner cannot prove by the transcript or otherwise, in the support of the jurisdiction, that it is a case for removal on account of subject-matter. The *allegata* and *probata* must correspond as in other pleadings. But the petition may be amended, either by curing defective averments, or by substituting additional or new allegations; and such amendments may be made in the federal court without remanding to the state court for that purpose.

**7.** JURISDICTION—CITIZENSHIP OF AN INFANT—DOMICILE—CHANGE OF INFANT'S—PARENTAL CONTROL — EMANCIPATION—CONSTITUTION—FOURTEENTH AMENDMENT.

*It seems* that a minor child may, at least for the purposes of jurisdiction in the federal courts, acquire a separate domicile and citizenship from that of the father during his life-time; but that result can only be accomplished by the emancipation of the child, and a complete surrender of the parental control, either to the child itself or some one standing *in loco parentis* as to the choice of domicile. Any mere consent of the father that the child may reside in another state, however permanently, cannot shift the domicile; but there must be in the father no longer any right to regulate the subject, and the right of choice must have been transferred to the child or some one else by the father's consent, or by operation of law. *Held, therefore*, where the father, a citizen of Tennessee, having lost, by death, the mother and all but one of his children, a girl five or six years of age, removed her to Kentucky and placed her to reside permanently with her aunt, that there had been no change of domicile to constitute the child a citizen of Kentucky, but that she was still a citizen of Tennessee, and the court had no jurisdiction where the plaintiff is also a citizen of Tennessee. *Held, also*, that the fourteenth amendment of the constitution has not changed the test of citizenship in its relation to the jurisdiction of the federal courts over the controversies of citizens of different states.

In Equity.    Motion to remand.

The first ground of the motion to remand was because the transcript from the state court was not filed until the *second* day of the next succeeding term of the federal court.    In explanation of this delay, the attorney for the petitioner filed an affidavit, the substantial part of which is in the following words:

"I further state that I obtained said copy a few days before the first day of the present term of this court, for the purpose of examining the same to see that it was correct.    I had examined the said copy before the first day of the term, and had determined to file it according to the condition of the bond, but on the first day of the term, being hurried about many matters of business, and my presence being required in one or more of the courts—state or federal —then in session, the copy of the record, or the filing of it, escaped my mind, and I did not think of it till the night of that day and after the office of the clerk of the court had been closed for the night.    Early in the morning of the next day I brought the copy of the record from my office to the court-house and had the clerk file it at once.    I further state that the omission to file the said copy arose from the cause stated, and not from any other cause, and not from any desire or intention to hinder or delay the suit or the progress thereof."

The second ground for the motion was that the petition for removal shows upon the face of it that the case is not removable:

(1) Because neither a next friend or guardian *ad litem* of a minor defendant can remove the case, or enter an appearance in the federal court in compliance with the condition of the bond for removal; nor can the father of the said minor, as such father, do so.    (2) Because all the parties—plaintiff and defendant—are shown to be citizens of Tennessee, and the allegation of the petition to the contrary is shown by the record to be untrue.

The facts appearing by the record are that the plaintiff, who is a citizen of Tennessee, filed this bill as assignee in bankruptcy of Robert McKenna, who is also a citizen of Tennessee, against the said bankrupt and his daughter, Maud B. McKenna, a minor, who is alleged in the bill, according to the state practice, to be "a resident" of Shelby county, Tennessee, as are the other defendants, all being likewise citizens of Tennessee.    The object of the bill is to set aside alleged fraudulent conveyances of land in Shelby county, Tennessee, made by the bankrupt for the benefit of his wife and children, all of whom have died since the conveyances except this defendant, Maud B. McKenna.    The petition for removal purports to be "the petition of Maud B. McKenna, by her father and next friend, Robert Mc-Kenna," and is signed and sworn to by him.    It states that she is "a citizen and resident of Louisville, in the state of Kentucky, and that all the other parties to this suit, both plaintiff and defendants,

are citizens and residents of the state of Tennessee," and contains all other necessary jurisdictional averments. The bond for removal is that of Robert McKenna himself, and is conditioned that he will, "as next friend of Maud B. McKenna, on the first day of the next session, etc., enter therein a copy of the record of said suit, and appear therein and enter special bail," etc., etc.

Since the transcript was filed in this court the defendant Robert McKenna, in aid of his petition for removal, and in opposition to the motion to remand, has filed the following affidavit, viz:

"Robert McKenna, being duly sworn, says he is the Robert McKenna referred to in this suit, and is the father of Maud B. McKenna, one of the parties thereto; that she is now between five and six years old; that he has been living at White's Station, in Shelby county, Tennessee, for the past 19 years; that during the yellow fever epidemic of 1873 the mother of the affiant, and his then wife, died of yellow fever at White's Station; that in 1878, when Memphis and the surrounding country was visited by the yellow fever again, that two children of affiant—being all of his children except Maud B. McKenna—also died of yellow fever at White's Station. These two children died September 18 or 19, 1878. A day or two afterwards affiant, with his then wife, and child, Maud B. McKenna, left the state of Tennessee and went to Louisville, Kentucky, it being the intention of all parties that affiant's wife and child should reside permanently in Louisville, affiant being fearful that by a continued residence in Shelby county he would lose the remainder of his family. Affiant expected, himself, to return to Shelby county for the purpose of trying to dispose of the property that his wife owned, but expected himself, after such disposal, to go to Louisville, Kentucky, to reside with his family. It was, however, his first intention to remove his wife and child permanently to Louisville, Kentucky, when they and himself left Shelby county for that place. After arriving at Louisville, Kentucky, the wife of affiant was taken sick of yellow fever, contracted at Shelby county, Tennessee, and died of that disease at Louisville, Kentucky, October 1, 1878. As before stated, on account of the repeated prevalence of fever in Shelby county, it was affiant's intention to change the residence of his wife and family, and his own, as soon as possible, and this intention became more fixed, if possible, after the death of his wife. After the death of affiant's wife, affiant being then a single man, was unable to properly take charge of a girl of the age of Maud B. McKenna. Affiant therefore placed said Maud B. McKenna with a married sister of his, Mrs. Jane Kirkup. The husband of Mrs. Jane Kirkup is John Kirkup, and they live in Louisville, Kentucky. By the consent of John Kirkup and the consent of Mrs. Kirkup the said Maud B. McKenna was placed by affiant with them, to live permanently with them in the state of Kentucky. The reasons for so doing are given above. The said Maud B. McKenna was so placed there with the intention of all parties that she should permanently reside there in the state of Kentucky, and with no intention of her returning to Tennessee. The said Maud B. McKenna has so continuously resided with Mr. and Mrs. Kirkup. At no time since then has there been any change of

this intention of any of the parties to change the residence of Maud B. McKenna, and it is now, at this date, the intention of this affiant, Mr. and Mrs. Kirkup, and the child herself, that this residence of her with Mr. and Mrs. Kirkup for the future shall continue. Affiant was unable to carry out his own intention to go to Louisville, Kentucky, but he and no one of the parties has ever had any other intention than that Maud B. McKenna should be a resident of Louisville."

There has, also, since the transcript was filed, been entered in the rule-day order book of this court the following appearance of Robert McKenna, as guardian of the defendant Maud B. McKenna; and the letters of guardianship have been filed, showing that he has, since the suit was commenced, and since its removal here, been appointed guardian of the minor by the proper court in Tennessee, viz.:

"Robert McKenna, who has been appointed, by the probate court of Shelby county, guardian of the defendant Maud B. McKenna, who is a minor, brings into court here his letter of guardianship, and enters his appearance, as such guardian, in behalf of the said minor, his said ward, to this suit.

"WM. M. RANDOLPH, Sol'r.

"Copied from Rule Docket, p. 42."

*Metcalf & Walker,* for the motion.

*W. M. Randolph, contra.*

HAMMOND, D. J. The affidavit of the attorney for the petitioner shows that the omission to file the transcript on the first day of the next session of this court was an inadvertence. It was filed on the next or second day of the session, and no injury could possibly have resulted to the other parties by the failure to comply with the letter of the statute. It would be, therefore, a very harsh rule, and entirely at variance with the analogies of the practice in this state, to hold that a slip like that had defeated the jurisdiction of this court and destroyed the efficacy of this statute. I have been much perplexed by the conflict of opinion shown by the very few cases on the subject in the different circuits, and more by the very strict rulings of the supreme court in the construction of the somewhat analogous statutes regulating the jurisdiction of that tribunal on writs of error and appeal. The principle involved depends upon a solution of the question, whether the statute is directory or imperative, and this is always a question of delicacy and the utmost difficulty; particularly so, since there is well-grounded complaint that the courts are too ready on one pretext or another to dispense with the command of the legislature by an application of this rule of construction. I fully agree with all that the supreme court of Mississippi said on this subject in

*Koch* v. *Bridges*, 45 Miss. 247, 258, and recognize the danger of. substituting the caprice or will of the judge for the command of the statute. Nevertheless, there is no doubt whatever that from the beginning of our law the courts have exercised the power of departing from the letter 'of the statute to attain the object of the legislature in passing it. The Statute of Merton, *c.* 3, required a certain character of case to be tried before the first jury, but it was construed that where there was no first jury it might be tried before the others ; "for the statute (albeit it be penal) shall not be so literally expounded that if it cannot be tried *per primos juratores,* that it shall not be tried at all, for *verba debent intelligi cum effectu.*" 2 Inst. 84, cited in an instructive opinion on this subject by the court of last resort in New York,—*People* v. *Sup'rs of Ulster,* 34 N. Y. 268,—and in *Rex* v. *Loxdale,* 1 Burr. 445, everywhere recognized as the leading case. Lord Mansfield declared that "there is a known distinction between circumstances which are of the *essence* of the thing required to be done by an act of parliament and clauses merely directory. The *precise time,* in many cases, is *not* of the *essence.*" Id. And, as is well expressed in *People* v. *Sup'rs of Ulster, supra,* the *indicia* by which the courts determine the intention of the legislature are so well known, and the rules by which a statute is held to be directory or imperative have been so long in practice, that—

"Legislative bodies must be presumed to have enacted statutes with reference to them, as it is in their power to use language so that the statute must be considered mandatory, thereby excluding the power of the court to construe them as directory. These rules do not subvert, but carry into effect, the intention of the law-giver, as it is to be gathered from the phraseology of the statute. A strict and literal adherence to the letter and form of a statute in minor or non-essential particulars will often defeat a remedy or destroy a right which it was the principal intention of the legislature to create or provide."

The supreme court, in *U. S.* v. *Kirby,* 7 Wall. 482, 486, says :

"All laws should receive a sensible construction. General terms should be so limited in their application as not to lead to injustice, oppression, or an absurd consequence. It will always, therefore, be presumed that the legislature intended exceptions to its language which would avoid results of this character. The reason of the law, in such cases, should prevail over its letter."

Again, in *French* v. *Edwards,* 13 Wall. 506, 511, it says :

"There are, undoubtedly, many statutory requisitions intended for the guide of officers in the conduct of business devolved upon them which do not limit their power, or render its exercise in disregard of the requisitions ineffectual. Such, generally, are regulations designed to secure order, system,

and dispatch in proceedings, and by a disregard of which the rights of parties interested cannot be injuriously affected. Provisions of this character are not usually regarded as mandatory, unless accompanied by negative words importing that the acts required shall not be done in any other manner or time than that designated. But when the requisitions prescribed are intended for the protection of the citizen, and to prevent a sacrifice of his property, and by a disregard of which his rights might be and generally would be injuriously affected, they are not directory but mandatory. They must be followed or the acts will be invalid. The power of the officer in all such cases is limited by the manner and conditions prescribed for its exercise."

In that case the statute in controversy was held to be mandatory; and so in the great case of *Galpin* v. *Page*, 18 Wall. 350, the same principle was applied in its relation to the jurisdiction of courts of special and limited authority; and, as is there and elsewhere abundantly shown, it is often applied in superior courts of general jurisdiction, where they are exercising special powers, not according to the course of the common law, by regular process and personal service in the usual form of common law or equity proceedings, but by seizure of property—as in attachment cases, for example—or some substituted process, or else where these special powers are exercised over a class of cases not within their ordinary jurisdiction, upon the performance of prescribed conditions made essential to the acquisition of the jurisdiction itself.

The case at bar does not, in my judgment, fall within any of these categories, and the mistake that is made in holding to a rigid and literal compliance with this requirement of the statute, that the copy of the record is to be entered "on the first day" of the next session of the court, is in supposing that it does, and that it is, therefore, a jurisdictional feature of the statute. We are not, in the exercise of our jurisdiction of removable causes, any more than in cases originally brought here, proceeding as a court of limited and special authority, nor as a superior court of general jurisdiction, exercising powers which are not according to the course of the common law and its regular course of process and personal service, nor yet such a court taking jurisdiction over a class of cases not within our ordinary jurisdiction. But we are a court of general jurisdiction, with this subject-matter embraced within the ordinary scope of our powers, and we are not proceeding by extraordinary processes, as attachment or publication or the like, but strictly upon personal service in the ordinary way. If it be an attachment suit, the same thing may be said of it, except that we are in the same predicament as the state court, and are only exercising concurrently its jurisdiction, whether

general or special. But even in that class of cases we are not exercising a special jurisdiction because of the *removal,* but because it was special in the state court and must be so here, and for the same reason. It is true no process issues from this court, but it does from the state court; and where the case comes within the influence of the constitution and laws of the United States and is removable here, the parties to the process understand that they are summoned not only to the state court, but, if the adversary party or they choose, to the federal court as well, to settle their controversy. *Moynahan* v. *Wilson,* 6 Cent. L. J. 28; *McLeod* v. *Duncan,* 5 McL. 343.

The jurisdiction is conferred by the constitution, and is plenary and exhaustive. This act of congress has vitalized the constitutional grant and regulated the jurisdiction. The second section defines the jurisdiction in removal causes, prescribes the class of cases to which we are authorized to apply it, and in itself contains no condition precedent or subsequent upon which its exercise depends. The third and seventh sections, relating to the matter in contention here, are purely *practice* regulations by which a method of procedure is prescribed, and are not at all jurisdictional. This may be said, it seems to me, of all the sections to this act, except the first and second, and that clause of the seventh which punishes the clerk of the state court for refusing a copy of the record, and confers jurisdiction of the offence. The framework of the statute indicates a purpose to define the whole civil jurisdiction of the court in the first two sections, and to regulate the practice in removal cases in the others; and to this were (perhaps subsequently) added in the eighth and ninth sections independent regulations applicable to all cases, whether originally brought here or removed. This is shown by the title to the act, which is instructive on this point. The whole statute must be looked to in construing any part, unquestionably; but then this obvious separation of subjects is equally as important and available as an indication of the intention we are seeking. Act March 3, 1875, (18 St. 470.)

We are, then, in the construction of this statute, authorized to treat it, not as one conferring extraordinary jurisdiction or prescribing extraordinary processes and methods of procedure, (except, perhaps, the eighth section, regulating substituted process,) but as one granting ordinary jurisdiction and regulating the practice applicable to it. There is, as the books disclose, a vast difference between the two kinds of statutes in the rules of construction to be applied, the one being strict and the other liberal.

If a citizen had any general or common right to have his case tried in the state court, and this statute were in derogation of that right, there might be some claim for a strict construction; but it is not at all a common or preferred right or privilege, and the right of the other citizen with whom he litigates to have it tried in the federal court is entitled to the same consideration. Therefore, the idea that the proceeding of removal is in derogation of a right, or is extraordinary, in the sense of these rules of construction, and to be so strictly construed that everything is to be taken against it, is untenable. We are to construe it just as we do the statutes giving us original jurisdiction, or as the state courts do statutes regulating their ordinary jurisdiction. Indeed, it is original jurisdiction, and the only difference is in the mode of acquisition. *Murray* v. *Patrie*, 5 Blatchf. 343, 346. It is not appellate, nor supervisory, nor extraordinary, but peculiar; and the peculiarity is that the contending citizens use the process of the state courts to originate their litigation, and subsequently get their controversy into the federal court by removal, instead of going there directly, and either has a right to do it. There are some circumstances under which it is necessary to do this to obtain the benefit of statutory rights and remedies, that could not otherwise be conferred; as, for example, where a simple contract creditor files a bill in this state to set aside a fraudulent conveyance, and thereby acquires a statutory lien he would not have, perhaps, if the same bill were filed in the federal court. T. & S. Code, (Tenn.) § 4288.

Undoubtedly, in the matter of regulating suits, whether commenced here or brought here after being commenced elsewhere, congress can prescribe such conditions precedent for the exercise of the jurisdiction as it chooses; and if it has said that, as an inexorable rule, we shall not proceed in this case unless the record is filed on the first day of the term, we must obey it. But the statute does not say so explicitly, and it is purely a matter of construction. Being open for construction, the question is, shall it be construed strictly against the jurisdiction, or liberally in favor of it? If it be a condition precedent, nothing can dispense with it, not even inevitable accident; and this seems to me an "absurd consequence," considering the nature of the case, and the character and purposes of the jurisdiction, as declared by the constitution, and shown by the history connected with its place in that instrument. Grammatical analysis of the third section does not disclose any intention to attach a forfeiture of the jurisdiction to a failure to file the record on the first day; nor does the seventh sec-

tion; while the latter says that if filed within 20 days, in the cases there provided for, "such filing and appearance shall be taken to satisfy the said bond in that behalf." This bond seems an important matter, and this statute, and all that have preceded it, instead of inflicting the penalty of forfeiting the jurisdiction, have provided another and a special remedy against neglect, which is a penal bond to secure to the adversary party his damages for it. Whether the court does or does not take jurisdiction after a failure to file the record, this bond protects the party against any injury he has received. *Morrissey* v. *Drake*, 10 J. R. 27; *Horton* v. *Miller*, 38 Pa. St. 270. It may be a condition precedent in the construction of the *contract contained in the bond*, which may not be excused, even if it becomes impossible by the act of God, much less by the act of the party. 3 Comyn's Dig. (5th Ed. A. D. 1825, by Day,) tit. "Condition, D 1," p. 96; Id. "L, 12," p. 121; 1 Comyn's Dig. tit. "Action on the Case, G," p. 330. But it does not follow that it is a condition precedent to the *jurisdiction of the court*. The cases consulted frequently point to the remedy by personal action against the defaulting officer or party as a sufficient protection, without holding the statute to be mandatory; and here we have provided a special security upon that personal action which would still more seem indicative of an intention that the statute shall be taken to be directory. It was so held on a construction of this act of congress by Mr. Circuit Judge McCrary. *Kidder* v. *Featteau*, 2 Fed. Rep. 616; S. C. 1 McC. 323.

But aside from this consideration this statute falls within the cases declaring the rules by which a statute shall be held to be directory. In *Brewer* v. *Blougher*, 14 Pet. 178, 198, it is said that it is undoubtedly the duty of the court to restrain the operation of a statute within narrower limits than its words import if the court is satisfied that the literal meaning of its language would extend to cases never designed to be embraced in it. And in *Oates* v. *Nat. Bank*, 100 U. S. 239, 244, Mr. Justice Harlan says that "a thing which is within the letter of the statute is not within the statute unless it be within the meaning of the makers."

In *Whitney* v. *Emmett*, Bald. 303, 316, it is said:

"Laws are construed strictly to save a right or avoid a penalty. They are construed liberally to give a remedy or to carry into effect an object declared in the law. It is judicial legislation to confound the parts of a law which are merely directory as to acts to be done with those which prescribe acts as conditions precedent to the vesting of a right."

And in *Russell* v. *Wheeler*, Hempst. 3, 6, it is said that, even—

"Where a limited jurisdiction is conferred by statute, the construction should be strict as to the extent of the jurisdiction, but liberal as to the mode of proceeding; and, where a statute prescribes a form of proceeding, a substantial and not literal compliance is all that is required."

And so it was held in *Heydon's Case*, 3 Rep. 7—

"To be the duty of the judges at all times to make such construction as should suppress the mischief or advance the remedy; putting down all subtle inventions for continuance of the mischief, *et pro privato commodo*, and adding force and life to the cure and remedy, according to the true intent of the makers of the act, *pro bono publico*." Potter's Dwarris on Statutes, (Ed. A. D. 1875,) 184.

The supreme court of Pennsylvania says:

"It would not, perhaps, be easy to lay down any general rule as to when the provisions of a statute are merely directory, and when mandatory or imperative. Where the words are affirmative, and relate to the manner in which power or jurisdiction vested in a public officer or body is to be exercised, and not to the limits of the power or jurisdiction itself, they may and often have been construed to be directory; but negative words, which go to the power or jurisdiction itself, have never, that I am aware of, been brought within the category. A clause is directory when the provisions contain mere matter of direction and no more, but not so when they are followed by words of positive prohibition." *Bladen* v. *Philadelphia*, 60 Pa. St. 464, 466; *Norwegian Street Case*, 81 Pa. St. 349.

Where a statute directs a person to do a thing at a particular time, without any negative words restraining him from doing it afterwards, or any expression from which such intent can be gathered, the naming of the time is directory, and not a limitation of authority. While, therefore, the duty may be performed at a subsequent time, and the action be valid, because time is not of the essence of the act, and is not a condition precedent to its validity, yet the statute should be obeyed, and the act done at the time specified. *Hugg* v. *Camden*, 39 N. J. L. 620. Where the object contemplated by the legislature cannot be carried into effect by another construction, there the prescribed time must be considered imperative; but when there is nothing indicating that the exact time is essential, it should be considered as directory. *Colt* v. *Eves*, 12 Conn. 243, 254. Accidents may happen which would defeat the authority if it cannot be exercised after the time mentioned. The naming the time must be, therefore, considered as directory and not a limitation of authority. *Pond* v. *Negus*, 3 Mass. 230; *Lowell* v. *Hadley*, 8 Met. 180. Neither the nature of the act to be performed, nor the language used by the

legislature, necessarily indicate a limitation of the power of the court, or a condition precedent to its exercise. *Fanning* v. *Com.* 120 Mass. 388. Where a statute required a brigade court-martial to be constituted on or before the first day of June, and it was not constituted till July, it was held valid, the provision being only directory. *People* v. *Allen*, 6 Wend. 486. A referee was required to report to the first term after the expiration of six weeks but did not till more than a year, and the statute was held directory for the purpose of expediting the proceedings and preventing delay. The law in these respects should be observed, but if a slip occurs it does not render the whole proceeding a nullity, but the officer or party delinquent should be made to respond according to the nature and consequence of his fault. *Re Empire City Bank*, 18 N. Y. 200, 220. Here we have, as before remarked, a special remedy and security to compel the delinquent to so respond. If it be clear that no penalty was intended to be imposed, then, as a matter of course, it is but carrying out the will of the legislature to decree the statute to be simply directory. *Corbett* v. *Bradley*, 7 Nev. 106. It was in that case a statute requiring certain claims to be presented within 30 days, and was clearly an act of limitations, and was held mandatory. A sheriff was required to file his bond "within 20 days," and it was held that it was directory, and he did not forfeit his office by failure. *People* v. *Holley*, 12 Wend. 481. A requirement that an election return should be filed on the day subsequent to closing the poll was only directory. *Ex parte Heath*, 3 Hill, (N. Y.) 42. A statute required a justice of the peace, before continuing a cause, to enter on the files the reasons for the absence of the signing justice, and it was held directory, and not mandatory or jurisdictional. *Holland* v. *Osgood*, 8 Vt. 276. A statute required that security for costs should be given before process issued, and it was held that the giving of the security was not essential to the jurisdiction, because the statute did not say that the giving of security was a condition in compliance with which only the process might issue. Nor did it provide that the process should be void, or be quashed, or set aside, if security should not be given. The court having general jurisdiction of the subject-matter and the parties may proceed if the security be given *nunc pro tunc*. *Parks* v. *Goodwin*, 1 Doug. (Mich.) 56. Statutes giving jurisdiction are always liberally construed in furtherance of justice, and such an interpretation as will work a forfeiture of the right is not favored. *Pearson* v. *Lovejoy*, 53 Barb. 407. Where the directions of the statute are given with a view to the proper, or duly

and prompt conduct of business merely, the provisions may be generally regarded as directory.  *Hurford* v. *Omaha,* 4 Neb. 336, 350.

These are some of the cases indicating the principle governing the courts in this matter, and the supreme court of the United States has frequently recognized and enforced these rules in the construction of statutes.  *Speake* v. *U. S.* 9 Cranch, 28; *U. S.* v. *Vanzant,* 11 Wheat. 184; *U. S.* v. *Dandridge,* 12 Wheat. 81; *Sup'rs* v. *U. S.* 4 Wall. 435. See, also, *Miller* v. *Gages,* 4 McL. 436.* The supreme court of Tennessee has frequently recognized this distinction between mandatory and directory statutes.  *Mount* v. *Kesterson,* 6 Cald. 452, 459; *Foster* v. *Blount,* 1 Tenn. 342; *Atkinson* v. *Rhea,* 7 Humph. 59; *Sellars* v. *Fite,* 3 Bax. 125, 131.  And in *Gregory* v. *Burnett,* 1 Humph. 60, the statute requiring transcript to be filed 15 days before the sitting of the court was held mandatory, because it especially enacted that if not done the judgment below should be affirmed.

In *Jackson* v. *Wiseburn,* 5 Wend. 136, it is said that it is the ordinary course of the court, upon cause shown, to enlarge the time to plead or other time prescribed for any purpose by the rules of practice of the court.  The rules of practice of the court, being established by the court, may be made to yield to circumstances to promote the ends of justice.  But not so as to a statute: it is unbending, requiring implicit obedience as well from the court as its suitors, and the court possesses no dispensing power.  But in *Kelly* v. *Moody,* 7 Hill. 156, it was said that defaults may be set aside in cases where the practice is regulated by statute, as well as where it depends on the rules of the court.  Indeed, our statutes of jeofails require amendments or acts to be done *nunc pro tunc,* in order to save the rights of the parties, without any distinction of that character.· We have several acts of congress as peremptory as the one we are considering which require this.  A section of the Revised Statutes says—

"That no summons, writ, declaration, return, process, judgment, or *other proceeding* in civil causes, in any court of the United States, shall be abated, arrested, quashed, or reversed for any defect or want of form; but such court shall proceed and give judgment according as the right of the cause and mat-

---

*Consult, also, *Henderson* v. *U. S.* 4 Ct. Cl. 75, 83; *Limestone Co.* v. *Rather,* 48 Ala. 440; *McKune* v. *Weller,* 11 Cal. 49; *Wheeler* v. *Chicago,* 24 Ill. 105; *State* v. *Baltimore Co.* 29 Md. 517, 522; *Stayton* v. *Huling,* 7 Ind. 144; *Hooker* v. *Young,* 5 Cow. 269: *Dutton* v. *Kelsey,* 2 Wend. 615; *Caldwell* v. *Albany,* 9 Paige, 574; *Seymour* v. *Judd,* 2 N. Y. 464; *Hill* v. *Draper,* 10 Barb. 454, 480; *People* v. *Schermerhorn,* 19 Barb. 540; *Barnes* v. *Badger,* 41 Barb. 98; Potter's Dwarris, St. 222, and notes; Id. 184; Sedgw. St. &. Const. L. 322, and notes; Id. 368; 2 Am. Law Reg. (N. S.) 409, and note; Cooley, Const. Lim. 77; 1 Smith, Lead. Cas. 687; 2 Ky. Law Rep. (March, 1881,) 166.

ter in law shall appear to it, without regarding any such defect or want of form, * * * and may at any time permit either of the parties to amend any defect in the process or pleadings, upon such conditions as it shall, in its discretion and by it rules, prescribe." Rev. St. § 954.

This section, both in letter and spirit, clearly confers the power and makes it the duty of the courts to cure such defects as this unless the removal statute is so imperative as to forbid it. Mr. Chitty says that some decisions have, on the subject of amendment, made a distinction between *rules of court* and *statutory rules* of practice, but he shows that they do not go upon any want of power, but on the determination of the judges to deny the amendment *in general* so that obedience to the statute may be enforced. 3 Chit. Pr. 54. Certainly, if this important proceeding is to be cut off from all amendments because the mode of proceeding is regulated by statute, it will be very much restricted. At common law, or under the English statute of jeofails, a writ of error was not amendable. 1 Comyn's Dig. tit. "Amendment, 2 C, 4," p. 614. And prior to the act of June 1, 1872, the power to amend it was much restricted with us, but that act enlarged the power of amendment, and conferred on the circuit and district courts further power to amend all process returnable before them. 17 St. 197. And this power is still further enlarged by another section of the Revised Statutes, which says:

"Any circuit or district court may at any time, in its discretion, and upon such terms as it may deem just, allow an amendment of any process, returnable to or before it, where the defect has not prejudiced, and the amendment will not injure, the party against whom such process issues." Rev. St. § 948.

And it was held to cure a writ of error from the district to the circuit court returnable to the first Monday of December instead of the first Monday of November, as it should have been, and this, even though the transcript was not filed before the commencement of the term to which it was properly returnable, the court saying the defect was one of form. *Semmes* v. *U. S.* 91 U. S. 21, 24.

Hence, if the filing of the transcript in this case, by analogy to a writ of error, can be treated as *process* by which we obtain jurisdiction of removable causes—and this is the most favorable view for the motion to remand—it is clearly amendable under this section of the Revised Statutes by ignoring the defect, or allowing it to be filed *nunc pro tunc*, as was done where a case was wrongly entitled. *Fourth N. B.* v. *Neyhardt*, 13 Blatchf. 393. But that it is not process in that sense I think is clear. It is the filing of the petition and bond in the state court that operates to transfer the case. *Taylor* v.

*Rockafaller*, 6 Rep. (Berton,) 226; *Shook* v. *Rankin*, 2 Cent. L. J. 731; *Fisk* v. *Railroad Co.* 6 Blatchf. 362.

The cases, commencing with *Villabolos* v. *U. S.* 6 How. 81, and *U. S.* v. *Curry*, Id. 106, and running numerously through the reports, including *Mussina* v. *Cavazos*, 6 Wall. 355, and *Edmonson* v. *Bloomshire*, 7 Wall. 306, relating to the exceedingly technical rules of the supreme court governing the acquisition of jurisdiction by that court through a writ of error or appeal by the filing of the transcript, furnish the strongest analogy in favor of the motion to remand. But, as stated by Mr. Justice Miller in the last-mentioned case, the intelligible ground of these decisions is that the writ of error and the appeal are the foundations of the jurisdiction, without which there is no right to revise the action of the inferior court, and that the writ of error, like all other common-law writs, becomes *functus officio* unless some return is made to it during the term of the court to which it is returnable. A careful comparison of the language of the acts on which these decisions are made with that of the one we are now considering shows that they are not at all alike in respect of this matter of prescribing the time. Neither the act of 1789 (1 St. 84, § 22) nor of March 3, 1803, (2 St. 244, § 2,) prescribe any time for filing the writ of error or the transcript. They only adopt the common-law mode of proceeding known as a writ of error, which was always returnable to the term of the appellate court next following the date of the writ, and it was here of the essence of the writ that it should be so returnable in order that the court should acquire jurisdiction. But it will be seen, from an examination of all these cases in the supreme court, that a default did not have any such effect as that accompanying a failure to file a transcript in these removal causes if the time is held under the act to be essential. A new writ of error could be sued out, notwithstanding the miscarriage of the first, at any time within the time prescribed by the statute of limitations, and the case be thus carried to the appellate court. The jurisdiction referred to by Mr. Justice Miller as founded on the writ of error that is lost by the failure to file the writ and transcript is not that over the subject-matter, but that over the parties, the writ and the citation being necessary to bring them into the supreme court. Here, however, the statute does not call for any *process*, or prescribe any, to give this court jurisdiction of the parties to a removed cause, and we are not, as once before remarked, acting as an *appellate* or other *supervisory* tribunal into which process is necessary to bring the parties. They are brought into the state court by process, and

we acquire jurisdiction in that sense by the same process as the state court acquires it. The petition and bond for removal in the state court arrest the proceedings there, and, *by law*, the parties and their controversy are transferred here without any writ or other process like the common-law writ of error; and it is a mistake, in my judgment, to suppose that the jurisdiction is to be subjected to the same technical rules as apply to that writ, or to treat the filing of the transcript as equivalent to it. It is immaterial what may be the *status* of the case between filing the petition in the state court and the filing of the transcript here. Dill. Rem. (2d Ed.) §§ 80–81. It may be in a defective state while thus *in transitu*, so that we cannot proceed here without a transcript; but I do not think it follows from this that the filing of the transcript is a condition precedent to be so strictly performed at the very day that unless so done we are deprived of all jurisdiction. Even in the strict practice pertaining to a writ of error there are certain dispensations indulged to prevent a failure of justice. Phil. Prac. (2d Ed.) 214, 215; 222; Id. 136. And although the writ is strictly returnable to the first day of the term, it may be filed during the term, and is good unless dismissed because not filed according to the rules; and this result is reached, for purposes of convenience and justice, by treating the whole term as one day, and that the first day, which fiction of the common law might as well be adopted to save the right of removal. *Ins. Co.* v. *Mordecai* 21 How. 195, 201.

It may be said that by a like construction of another clause in the same section of this statute the time for filing the petition and bond in the state court may be enlarged, which is not permissible. *Gibson* v. *Johnson*, Pet. 44. But the distinction is obvious; for the intention is there manifest that the petition must be filed before trial actually commenced, and before or at the term at which the cause could be first tried, and not after. The phraseology necessarily shows that this provision of the statute is imperative, because it is not prescribing a precise time within which a thing must be done, but a particular condition or *status* of the case which will entitle it to be done at all. There is not here a direction for filing a petition within a certain time, so much as a description of the class of cases in which a removal may be had. The idea of time is not the leading one, nor of the nature or essence of the particular subject, for it may be variable according to many circumstances; but the reference to time is only for the purpose of describing the *status* of the case that is to be removed. It is not so in the matter of filing the transcript; and the

two provisions serve, in my judgment, to illustrate the whole doctrine of mandatory and directory statutes. It does not, on the one hand, seem to me, at least, that congress thought it very important, except for the orderly and prompt dispatch of business, that the transcript should be filed on the first day of the term of this court; and, on the other, it does seem important and necessary to fix some stage of the proceedings in the state court after which there should be no removal. This provision is prohibitory as to time, and negative in the very nature of the object the legislature has in view. The other is affirmative only; and where this is the case, the courts will not add the words "and not after" by implication. *Ryan* v. *Vanlandingham*, 7 Ind. 417, 424. But even this clause of the statute, under the influence of the principle that enlarges the remedy, has been, by construction, extended so as to include cases not within its letter. *Removal Cases*, 100 U. S. 457, 473; *Nat. Bank* v. *Wheeler*, 13 Blatchf. 218.

The authority of adjudicated cases is so conflicting that a ruling either way on this ground of the motion to remain would find support, and I have, therefore, endeavored to get at the governing principle, quite independently of the cases more or less closely allied to the one we have in hand. Considering that the clause we are construing has been in all the acts from 1789 to the present time, there are remarkably few cases on the point to be found in the reports. The only expression of the supreme court is found in the *Removal Cases*, 100 U. S. 457, at p. 475. By fault of the clerk of the state court the removing party did not file the transcript on the first day, but did on the second, and the court overruled the objection, saying:

"While the act of congress requires security that the transcript shall be filed on the first day, it nowhere appears that the circuit court is to be deprived of its jurisdiction if by accident the party is delayed until a later day in the term. If the circuit court, for good cause shown, accepts the transfer after the day, and during the term, its jurisdiction will, as a general rule, be complete and the removal properly effected."

This seems to leave the question to the discretion of this court to either accept or decline jurisdiction; but, of course, that discretion is to be regulated by the rules of law applicable to the proper construction of the statute and correct practice under it. In the cases already cited it will appear that there is much more latitude allowed where the delay is caused by the act of an official than where it is caused by the act of the party himself. 2 Am. L. Reg. (N. S.) 409,

and notes. In *McLean* v. *Railroad Co.* 17 Blatchf. 363, it was held, notwithstanding this decision of the supreme court, that the neglect of an attorney, like that in this case, was not an accident or inadvertence within the ruling, and that after a failure to file the transcript there could be no subsequent removal. This is in itself an important consideration, because, in the analogous cases of a writ of error to the supreme court already considered, the court seems to justify its refusal to take the case somewhat on the ground that, until barred by statute of limitation, a second writ may be sued. In that case the transcript was filed three days after it should have been, and it was held to be essential that it should be filed on the very first day, to give the court jurisdiction, and that the enumeration of causes for which a case should be remanded, as contained in the fifth section of this act of congress, does not exclude the power of the court to remand for other causes. *McLean* v. *Railroad Co.* 16 Blatchf. 309. In *Broadnax* v. *Eisner*, 13 Blatchf. 366, it was held to be laches not to file the transcript on the first day unless it were shown to be impossible to procure it. In *Bright* v. *Railroad Co.* 14 Blatchf. 214, the transcript was filed on the first day of the term next succeeding that at which it should have been filed, and it was held that only a strict compliance would give the court jurisdiction. In *Clippinger* v. *Ins. Co.* 8 Chi. Leg. News, 155; S. C. 22 Int. Rev. Rec. 47, although the removal was obstructed by the state court refusing it, which action was afterwards reversed, and immediately thereafter the transcript was filed, it was held too late. To same effect is *Cobb* v. *Ins. Co.* 3 Hughes, 452. On the other hand, in *McBratney* v. *Usher*, 1 Dill. 367, and *Hyde* v. *Ins. Co.* 2 Dill. 525, it was held that if the removing party fails to file the transcript the adverse party may do so; and in one case, where the removing party had only filed a copy of the summons, when he should have filed a complete transcript, the court gave him further time. If the rigid rule of the above case, holding the time of filing an essential element of the jurisdiction, had been adopted, these cases could not have been so decided. In *Jackson* v. *Ins. Co.* 3 Woods, 413, the transcript was filed 14 days after the first, and it was held not to be fatal to the jurisdiction, although no excuse seems to have been offered for the failure. So, in *Kidder* v. *Featteau*, *supra*; S. C. 1 McC. 323, where the delay was 43 days, and no excuse was offered, the jurisdiction was maintained. There seems to be the recognition of a general principle that where a cause has been removed and falls within the act of congress, it will not be remanded for irregularities which can be remedied and have worked no injury to the adverse party. *Dennis* v.

*Alachua Co.* 3 Woods, 683; *Osgood* v. *Railroad Co.* 6 Biss, 330, 335. And the late circuit judge of the eighth circuit seems to approve this latter class of cases. Dill. Rem. (2d Ed.) §§ 83, 85, and notes. See, also, 20 Am. L. Reg. (N. S.) 24, 40.

Embarrassed as I have been by this conflict of authority, I am satisfied, for the reasons I have stated, that the jurisdiction should not be defeated by an excusable failure to file the transcript on the first day, notwithstanding the seemingly peremptory language of the statute, which, I think, in that respect is only directory. In this case the reasons given for not filing in time seem to me excusable, in view of the exceedingly brief delay. But I think proper to say, in the light of the authorities consulted, that I am not prepared to hold that every negligence should be excused, and the time enlarged, in all cases where no special injury to the other side appears, but that the true rule seems to be that the statute must be strictly obeyed, and a failure to comply with it must be reasonably accounted for, before the court will exercise its power to enlarge the time. Inexcusable negligence in itself imports an injury to the adverse party. And while the statute may be held to be directory merely, and not mandatory, for the purposes I have stated, it does not follow that it is nugatory in that regard, or that the courts can ignore its plain requirement that the transcript shall be promptly filed on the first day of the term.

The second ground for the motion to remand presents as much difficulty as the one just determined, and raises several important questions of practice under this statute. It must be conceded, as it is, that in a proper case, and in a proper mode, a minor defendant or plaintiff may remove his controversy into this court, as other parties may, for the act of congress makes no distinction between cases where the parties, or some of them, are infants, and where they are *sui juris,* but confers the right on any party to a suit coming within the jurisdiction; and it cannot be supposed, therefore, that suits by or against infants are excluded from the operation of the act. But how the removal is to be made in these cases is not prescribed, nor has it been indicated by any case or text-writer, so far as I can find from anything brought to my attention by counsel or developed by my own investigations. That the jurisdiction depends on the citizenship of the infant and not that of the next friend, where he is a *plaintiff,* seems established. *Williams* v. *Ritchey,* 3 Dill. 406. The same is true of a married woman as plaintiff. *Wormley* v. *Wormley,* 8 Wheat. 451; *Ruckman* v. *Palisade Co.* 1 FED. REP. 367.

In cases of executors, administrators, and trustees, generally, the rule is that the citizenship of the real and not the nominal party governs; and where such trustees are the real parties in interest their own citizenship, and not that of the parties they represent, controls the question, though it will be seen that the character of the suit, as one at law or in equity, enters sometimes into the determination of the question whether the trustee or the *cestui que trust* is the real or nominal party.   Dill. Rem. (2d Ed.) § 54, and notes, p. 68; Bump, Fed. Proc. 133, 134; Id. 176, 184.   Again, the cases cited will show that in *removed* causes the *status* of the case, as affected by state statutes and methods of procedure, enters into the question of real and nominal parties to the record.   Now, when an infant is a necessary party to the record the necessity of binding him to what is done by proper process and methods of procedure is apparent; for, as remarked by counsel here, it is of the utmost importance, in a case affecting the title to land, that no mistake shall be made in the matter of jurisdiction over the person of the infant, while it may be quite unimportant whether a state or federal court tries the case, if either may properly try it under the law.

Actions by and against infants, or rather those actions which concern their property, are so much changed by state legislation that attention must be given to rights thus acquired and distinctions thus established, or we are likely to get into confusion in administering a jurisprudence itself destitute of all statutory regulations on that subject.   From the beginning these removal acts have obviated all necessity for process in this court by requiring the defendant, as a condition of his right of removal, to enter an appearance in this court. But, as to infant defendants, this cannot be done, for they cannot waive process or enter an appearance, nor can it be done without service of process by any one for them.   After process served, their appearance may be entered for them, but the service is a prerequisite to any authority in that behalf.   In original cases in the courts of the United States, sitting in equity, there can be no defence otherwise than by guardian *ad litem*, and one cannot be appointed, nor the infant bound, until service of process upon him.   Equity Rule 87; *Bank of the U. S.* v. *Ritchie*, 8 Pet. 128; *O'Hara* v. *MacConnell*, 93 U. S. 150; *N. Y. Life Ins. Co.* v. *Bangs*, 13 Cent. L. J. 88; S. C. to be reported in 103 U. S.; *Carrington* v. *Brents*, 1 McL. 174.

As I understand the chancery practice to which we are bound by equity rules 91 and 87, an infant always sues by his next friend and defends by his guardian *ad litem*, where he is personally a necessary

party to the record; but the court generally devolves the duty in either case upon the regular guardian, or will sometimes sustain that guardian's action in that behalf without the technical formality of an appointment as *prochein ami*, or guardian *ad litem*, 1 Danl. Ch. Pr. (5th Ed.) 160, § 9; Sch. Dom. Rel. 592, *c*. 6; Id. 389, *cc*. 1, 2; Bing. Inf. *c*. 9, p. 118. But never is service of process upon the guardian alone, or upon the parent, or other substituted process of that character, sufficient to bind the infant where he is personally an essential party defendant. It must be served on him in person. See the authorities above. Now, where the regular guardian has power under his appointment, whether it be judicial, statutory, or testamentary, over the estate of the infant, and occupies as to that estate such a position that a suit by him or against him will be effectual to bind it and the infant, suits brought by him and process served on him will be sufficient in many cases, whether the infant be regularly made a party or not. In that class of cases, the jurisdiction of the federal courts, as to citizenship, will depend wholly upon the citizenship of the guardian, as in case of any other trustee, and not that of the infant, unless it be a suit in which, in a court of equity, the *cestui que trust* is an indispensable party, in which event it would depend on the circumstances of the case how the court would treat the parties in deciding which would be the nominal and which the real party in interest, in view of the question of jurisdiction, or whether they would be both regarded as indispensable. If this were a case originally brought in this court, standing as to parties in the shape it now does, there is no doubt whatever that this infant defendant, like all other defendants, assuming that she is a citizen of Kentucky, would have to be sued in the district of her residence, so that process could be personally served upon her, if the case is to be treated as a personal action to cancel the deeds of conveyance under which she claims title to the land; or if it be a suit *in rem*, or of that nature, against the land, there might be substituted process under the eighth section of the act of March 3, 1875, (18 St. 472,) which is understood to dispense with the requirement of personal service as well in the case of infants as other defendants. *N. Y. Life Ins. Co.* v. *Bangs, supra; Mohr* v. *Manierre*, 101 U. S. 417, at pp. 421, 422. But this case being removed from the state court, the question is whether we are to proceed now to bring in the infant, who has removed it, under this section of the act of congress, as her counsel contends we may; whether we are to treat her as already in this court by reason of her petition for removal, as he also insists she is; or whether we are to

resort to substituted process allowed by the practice in the state court of equity from which the case comes.

Let us look at the case as it stood in the state court, and see what were the rights of the plaintiff in this matter of process as against this infant defendant; for it will be seen that the methods of procedure in the two courts as to substituted process are entirely different, particularly as to infant defendants. Generally, in the state equity courts, any non-resident defendant can be brought into court by simple publication in a newspaper, according to the terms of the statute. T. & S. Code, (Tenn.) §§ 4352–4359; 1 Meigs' Dig. (2d Ed.) § 605, p. 759, and cases cited. In attachment cases the writ must be issued and levied, and also notice given by publication. T. & S. Code, §§ 3518–3526; 1 Meigs' Dig. § 275, p. 272; Id. § 605, pp. 761, 762. In suits for the administration of estates, solvent and insolvent; in those for the sale or partition of lands of persons under disability; in actions of ejectment, or other proceedings affecting their estates,—there are special regulations in regard to infant defendants whose lands are to be sold for the ancestor's debts, or whose estates are to be divided or converted into money for their own benefit or otherwise affected by the litigation. But it will be found that there is no uniformity whatever observed in these regulations, and it depends upon the character of the proceeding in each case, and often on the particular court in which it is pending. Sometimes, and perhaps generally, service of process upon the regular guardian alone, whether the infant be resident or non-resident, whether the guardian be named as a party to the bill or not, and whether it be a personal action or one solely in relation to the property of the infant, will suffice to bind the infant and his property. But this is not always so, and sometimes both must be served; and when specially required, as it often is, the infant must be served personally, whether he has a guardian or not. Where there is no regular guardian, service directly upon the infant must be had and a guardian *ad litem* appointed; but in nearly all cases, I believe, provision is made for substituted process by publication where the infant is non-resident and has no regular guardian within the state; but in one instance, at least, provision is made for a sale of his land where he is non-resident, without any substituted process or appearance for him whatever, upon a return of two *nihils*. T. & S. Code, (Tenn.) §§ 2257, 2260, 2261, 2338, 2380, 2516, 2517, 2829, 3257, 3264, 3325, 3652, 4099, subsec. 7, § 4420, subsec. 4; 1 Meigs' Dig. § 512, p. 512; Id. § 604, p. 759; 2 King's Dig. (2d Ed.) §§

3258, 3259, 3260, 3267; 1 King's Dig. § 1107. From this statement it will appear how different is the mode of practice in the state courts from that which obtains in the federal courts, as already described; and, as before pointed out, in these removal causes, where the parties are *sui juris*, the state statutes prescribing substituted service are wholly immaterial, because the act of congress requires an appearance as a condition of removal; but they become of vast importance when we come to determine how the infant defendant is to be bound in a case sought to be removed from a jurisdiction where these modes are adopted to that of another, where it is either impossible to bind her for want of her presence within the jurisdiction, or there is only a limited mode, in certain cases, where she is without. In the state court this case would fall within the general rule where the infant defendant, upon return of process not found, as this was, and affidavit of her non-residence, could have been brought in by substituted process of publication, because the bill alleges that she had no regular guardian, a guardian *ad litem* would have been appointed for her, and she would have been fully bound; for while the bill prays a sale of the land, at the election of the assignee, for distribution,—to decree which, perhaps, a state court would have no jurisdiction,—it is not a bill to sell land of a person under the disability of infancy where personal service on the infant is required. It is rather in the nature of a personal suit against her to cancel as void the deeds under which she claims, than a proceeding against the land. However this may be, it is not, I think, a case requiring under the state statutes personal service on the infant, but it might be served on the regular guardian, if she had one; and, in whatever view the bill be considered, being non-resident, or out of the state, and having no regular guardian in it, publication was all that was required. If it had been made to appear to the state court as it now does here, or by amended and supplemental bill, that subsequently to the filing of the bill a regular guardian had been appointed in this state, the court could have directed *alias* process to be served on him, or, without process, allowed him to appear and defend the suit, or else could have directed publication and appointed a guardian *ad litem*, taking care to appoint the regular guardian, unless there should be some reason for appointing another. I am of opinion either of these modes would have been proper in the state courts, and have no doubt whatever that under the state practice the appearance of a regular guardian in a case like this is all that would be required, no process of any kind being necessary if he voluntarily appears, though

out of abundant caution most practitioners prefer to serve process on the infant in all cases where it can be done, or to make publication if non-resident, whether there be a regular guardian or not. This grows out of the want of uniformity in the special regulations already mentioned, and the difficulty of determining whether the given case would fall under those statutes requiring service on the infant personally, or on both guardian and infant.

Having now determined that in this case—and I wish to confine the ruling to those cases where the infant may be bound by service of process alone upon the regular guardian, and leave others to be determined as they arise—the infant defendant would have been bound in the state court, without the service of any process, by the appearance in her behalf of her regular guardian, let us inquire what effect is produced by removal to this court under the peculiar facts of this case. I have shown that in an original case in this court service of process upon a regular guardian, or appearance by him without service upon the infant, would be ineffectual; the only substituted process known to the federal statutes being that under section 8 of the act of March 3, 1875, (18 St. 472.) That section, as I understand it, applies only to suits "*commenced* in any circuit court of the United States," and does not apply to removed causes, and for the obvious reason that as to those causes the act contemplates an *appearance* here *voluntarily* of the removing defendant, and no process is necessary. But this would altogether defeat the right of an infant defendant who cannot appear *voluntarily* to remove his case, unless some one can appear for him without process, or we resort to the state process to bring him in, for no federal process can reach him outside of the district where he actually resides. We cannot issue state process from this court, whether it be by writ or publication; and therefore it seems to me necessary to hold that where there is an infant defendant there can be no removal until, by effectual process, he has been first brought into the state court and some one there authorized to appear for him in that court. If such person may appear there without process and bind the infant, he may appear here without process and bind him to a like extent; but there must be a preliminary appearance in the state court to supply the want of process there, so that that court should have the infant bound to answer the suit, and he be brought here with that bond upon him; for we cannot supply it, nor substitute one for it, nor can he under the law voluntarily forego or waive it, and it is absolutely

necessary to the rights of the plaintiff that it should be put upon him. And as section 4 of the act of March 3, 1875, (18 St. 471,) preserves to the plaintiff all rights he has acquired by virtue of the proceedings in the state court in the matter of process and the right to compel an appearance, I am of opinion that in any case sought to be removed from a state court to this court, where the removing party is an infant defendant, there must be first an appearance in his behalf in the state court by some one authorized by the state laws to make that appearance, and that whether it be voluntary, or coerced by direct or substituted process, it is essential as a preliminary step to the removal, and cannot be supplied by appearance here, and that the removal must be by the person authorized by law to bind the infant by such an appearance.

If it were not for this necessity of having the infant defendant bound by process or an authorized appearance, as to which the law is always strictly to be pursued, I should not hesitate to hold that a next friend could file the petition and bond for removal, because, although an infant defends by his guardian *ad litem*, the functions of that representative are strictly defensive, and whenever the infant becomes an actor, as by filing a cross-bill or petition, he proceeds by next friend, usually the guardian *ad litem*, acting in that capacity in that particular suit; and even a regular guardian, with power to sue, proceeds or is taken technically as the next friend. 1 Danl. Ch. Pr. 68, 69, 77, (5th Ed.;) 2 Danl. 1595. Where the regular guardian has power, under the statute appointing him, to bring suits—as he has in Tennessee—of course he can act in that capacity, and it is wholly immaterial whether he is called guardian or next friend, and I have no doubt such a guardian may file the petition to remove. *In re Brocklebank*, 6 Ch. Div. 358, it was held an infant might institute bankruptcy proceedings in his own name, and it is a general rule he may, by next friend, pursue any remedy others have. But it is insisted that a guardian *ad litem* cannot do it, because—

"He is to defend the suit in the court from which he derives his authority, according to the rules and principles of law applicable to the case, as administered in that tribunal, and in conformity with the ordinary mode of trial and practice of the court in similar cases. It is not within the scope of his authority or duty to change the tribunal for the trial, or that the decision shall be upon principles other than those applicable to like cases in the forum in which the suit is pending. His special and restricted powers admit of the exercise of no such discretion." *Hannum's Heirs* v. *Wallace*, 9 Humph. 129, 136.

This was said in denial of the power to submit to arbitration, and

is, no doubt, a correct statement of the law. But it is a sufficient answer to it to say that congress, with plenary authority over the subject, in the case of infant defendants who are citizens of other states, has, by necessary implication, conferred the authority to remove the cause to the proper federal court; and, certainly, the principle cannot be resorted to to defeat the right of an infant defendant to a removal in those cases where he must be represented by a guardian *ad litem.* If the power of representation is to be thus strictly confined to that court and suit, it necessarily results that there can be no removal, unless we resort to the general principle that an infant may assert any right or pursue any remedy through a *next friend,* and in that capacity the guardian *ad litem* may remove the cause; and, if he refuses, I should not hesitate to say that any regular guardian, parent, or near relation, or other person upon whom the courts devolve that duty, might act in his behalf, and such act would not be "officious," as has been argued. It is said circumstances might exist which would render it to the interest of the infant to have the case remain in the state court, and an unwise or fraudulent next friend might seek to remove it to his damage. If such a state of circumstances be possible, I have no doubt the federal court, acting on the principle that governs all courts, would protect the minor by remanding the cause, upon the ground that it was deleterious to remove it.

The suit, when properly removed, proceeds under the direct command of the statute "in the same manner as if it had originally commenced in the said circuit court." Act March 3, 1875, (18 St. 471, § 3.) It would, therefore, be entirely competent for this court, after such a removal, to appoint a guardian *ad litem* and proceed with the case; for although the jurisdiction of the federal courts of equity does not extend to the care and protection of infants and their property generally, as do other courts of equity, those powers belonging to the states, they have abundant power to bind them and protect them in cases and controversies within their jurisdiction. *N. Y. Life Ins. Co.* v. *Bangs, supra.* My best judgment in these matters of practice may be thus summarized:

1. An infant defendant, where the case is removable, may remove his suit into the federal court by his regular guardian, guardian *ad litem,* or next friend, who may file the petition and give the bond.

2. But this cannot be done until proper steps have been taken by the service of process, either directly or by substitution, to bring the infant defendant into the state court according to the requirements

of the law of the state as applicable to that case, or until there is an appearance there for him by some representative authorized by the state law to appear for him without process.

It is insisted by the learned counsel for the petitioner here that McKenna, having since he filed the petition become the regular guardian, may ratify what he has done as next friend, and thus perfect the removal. Potential as the principle of ratification sometimes is, I do not think it can be safely applied to supply a want of compliance with those conditions prescribed by the statutory or municipal law as a prerequisite for obtaining jurisdiction over the person or property of an infant. If the infant could herself ratify, it might be different. No case cited justifies the argument in favor of the doctrine. McKenna was not a guardian, either regular or *ad litem,* at the time of filing this petition; no process had been served or substituted by publication; and the state court had obtained no jurisdiction over the infant when he came in and as *next friend* sought to remove the case in her behalf. The merely filing the bill and naming her as defendant did not make her a party. She had no power to voluntarily appear and waive process, and no one was authorized to appear for her. Subsequently he did obtain the necessary authority by his appointment as guardian in a case like this, under the state statutes, to appear voluntarily, for it is a case, I think, where service of process on the guardian alone binds the infant; and where that is the case I do not see why he may not voluntarily so appear without process. But these statutes only operate in the state court, and can confer no power to voluntarily appear in a federal court where the notion of a voluntary appearance by a guardian or any one else to bind an infant is wholly unknown. The only theory on which it could be permitted is that we are here, *pro hac vice,* in these removal causes, a state court, with the same powers under these state statutes that those courts possess. I think this is not the theory of the act of congress, but the one I have indicated, which is that the defendant comes from the state court only after he is properly there by an appearance in that court. Besides this, in a former part of this opinion we have seen how strictly we are bound to the conditions of the removal act in order to acquire jurisdiction; and it seems to me plain that the petitioner cannot depend on a subsequently-acquired authority to aid the petition for removal.

It is further insisted that this is a case arising under the constitution and laws of the United States and that we have jurisdiction here irrespective of citizenship, and for that reason this case should not

be remanded. I have no doubt it is that character of case. By the very terms of the bankruptcy acts the assignee might have filed this bill in this court, irrespective of the citizenship of the parties, and this power could not be given him if it were not a case "arising under the constitution and laws of the United States." *Railroad Co.* v. *Mississippi,* 102 U. S. 135; *Lathrop* v. *Drake,* 91 U. S. 516; *Burbank* v. *Bigelow,* 92 U. S. 179; *Van Allen* v. *Railroad,* 3 FED. REP. 545; S. C. 1 McC. 598, 20 Am. L. Reg. (N. S.) 24, 42; *Babbit* v. *Clark,* 13 Cent. L. J. 248. But by these same acts of congress the assignee has been vested with power to bring this suit in the state court where he did bring it, and we can only obtain jurisdiction by removal as in other cases. *Claflin* v. *Houseman,* 93 U. S. 130.

This petition for removal makes no mention of that ground of jurisdiction, but is based wholly on the ground of difference in citizenship. The character of this suit appears by the bill filed in the state court; but while we may look to that in aid of the allegations contained in the petition for removal, we cannot depend wholly on it to furnish the jurisdictional averments. The petition itself, like all other records in this court, must show by proper averments the jurisdictional facts, and the *allegata* and *probata* must correspond. This petition should have averred at least that it was a case "arising under the constitution and laws of the United States." *Ins. Co.* v. *Pechner,* 95 U. S. 183; *Bible So.* v. *Grove,* 101 U. S. 610; *Trafton* v. *Nougues,* 4 Sawy. 179; *Keith* v. *Levi,* 1 McC. 343; S. C. 2 FED. REP. 743; Dill. Rem. (2d Ed.) § 73, p. 89; Id. § 70 *et seq.* This is the rule in original cases where the declaration or other pleading must contain these averments; and I think it applies here. *Ex parte Smith,* 94 U. S. 455. In *Ins. Co.* v *Pechner, supra,* it is said that the "petition for removal, when filed, becomes a part of the record in the cause. It should state facts which, taken in connection with such as already appear, entitle him to the transfer." It would appear from expressions in some of the cases that we may look to the record of the state court, or to the removal petition, for the jurisdictional facts; but I do not find it any where decided that, when a case presented by the petition for removal is predicated on the citizenship, we may retain it if it appears by the record in the state court to be one arising under the constitution and laws of the United States. Dill. Rem. § 70, 71. Orderly proceedings require that one who seeks, by petition or other pleadings, any remedy or redress depending upon statutory grounds prescribed as conditions to that remedy, should state the facts upon which his petition is founded, and not require

the courts to search for these averments *aliunde* his petition. If the fact that the suit arises under the constitution and laws of the United States may be shown by reference to the record coming from the state court, I see no reason why it may not be shown as well by affidavits or depositions, or other evidence put in the record here for the purpose; nor why this practice should not apply as well to a declaration in an original suit, both as to subject matter and citizenship. Another reason why this averment should appear in the petition may be found in the fact that the adversary parties are entitled to know on what grounds the removal is sought, and not be left to grope in the dark; and to determine for themselves whether it is on account of citizenship or the subject matter the petitioner claims the right. It would be just as reasonable to leave the adversary party to determine for himself whether the removal is sought on account of local prejudice, under the act of 1867, to be proved at the hearing of the motion to remand, or because the controversy arises under a revenue law under the act of 1833, or for acts done during the rebellion by federal authority under the act of 1867, where these grounds are not mentioned in the petition. It would be a very loose practice to dispense with this averment in the petition of the ground of removal, or to allow one ground to be alleged and another relied on at the hearing of that petition, on the motion to remand. If this were the practice, I can see no need of any averment on the subject in the petition, nor why the whole matter should not be tried on the transcript, and such other proof as may be offered, without any petition at all. If this averment of the grounds of removal is not necessary, there is no other use for a petition. I am, therefore, of opinion that the petition for removal must state the jurisdictional facts, and if it states one ground allowed by the statute, as that of citizenship, no other can be relied upon in reply to a motion to remand, although it may appear by the transcript from the state court that on some other ground it could have been removed. I do not think *Ruckman* v. *Ruckman*, 1 FED. REP. 587, and *Norris* v. *Mineral Point Tunnel*, 7 FED. REP. 272, are against these views, when properly considered. In the first, counsel only misconstrued the facts shown by the petition; and, in the second, he only cited the wrong act of congress; while in both the jurisdictional facts appear by the petition for removal, namely, the difference in citizenship.

Application is made to amend the petition by inserting the necessary averment that the case is one arising under the constitution and laws of the United States, and by allegations of the facts showing that

it does so arise. Under the Revised Statutes, I have no doubt of the power of the courts to permit amendments to these petitions for removal. There is no reason why they should be any exception to the general practice under these statutes. Rev. St. §§ 954, 948; Bump, Fed. Proc. 148, notes. Defective averments have been amended in these petitions by permission of the courts, and it seems the usual liberality, under like statutes, would justify an entire change of the petition by alleging another ground for removal than that contained in the petition. Dill. Rem. § 79, p. 99, and notes. In *Barclay* v. *Levee Com.* 1 Woods. 254, the petition for removal erroneously alleged that the party was a citizen of Louisiana, and he was permitted to amend by showing he was a citizen of Tennessee; and in *Houser* v. *Clayton,* 3 Woods, 273, it is said these petitions may be amended. In *Kaiser* v. *Railroad Co.* 6 FED. REP. 1, 5, the *plaintiff* sought a removal, and anticipating that the motion to remand would be decided against him, because it was not shown by the record that the difference in citizenship existed at the time the suit was commenced, asked leave to amend *the transcript from the state court,* and he was permitted to do it, with the expression of a doubt whether he could go further in amending than to show a more complete transcript, and whether he could, by such an amendment, show that as a fact the difference in citizenship did then exist. The question was reserved. In *Beede* v. *Cheeney,* 5 FED. REP. 388, the cause was remanded because the petition was in the present tense, and therefore did not show that the parties *were* at the time the suit was commenced of different citizenship. But in neither of these cases was application made to amend the *petition for removal,* as in the other cases already cited, where it was allowed; and I think they cannot be taken as authority against the right to amend. The requirement that the record shall show jurisdiction is no more imperative in removed than original causes; and in the latter, under the statutes authorizing the courts to permit amendments, they are very liberal in allowing the jurisdictional facts to be shown by amendment of the declaration or other pleading. *Michaelon* v. *Denison,* 3 Day, 294; *Fisher* v. *Rutherford,* Bald. 188, 193; *Re McKibben,* 12 N. B. R. 97, 102; *Kelsey* v. *Railroad,* 14 Blatchf. 89; Bump, Fed. Proc. 148, notes; Id. 655, and notes; *Connelly* v. *Taylor,* 2 Pet. 556, 564; *Jackson* v. *Ashton,* 10 Pet. 480. The statute is very broad, and says that no summons, writ, declaration, return, process, judgment, *or other proceedings* shall be abated, arrested, quashed, or reversed for any defect or want of form, but the courts shall permit either party

at any time to amend *any defect* in the process or pleadings upon such conditions as may be prescribed, and contains, in my judgment, a legislative command to permit a petition like this to be amended to the same extent that other pleadings may. Whether they can be amended after the time prescribed for removal has expired, or rather whether the amendment will operate only from the time at which it is made, or will relate to the time when the petition for removal was filed, it is not necessary in this case to decide.

I should, therefore, allow the application to amend, and retain the jurisdiction, but it does not advance the case at all, and, for the reason that we have the same difficulty as before in regard to the service of process upon this infant defendant, who must be brought into court in any event, and we have no method of getting her here under our practice. We cannot send a subpœna to Kentucky for her, nor can her guardian voluntarily appear, without personal service, according to our practice. He may do that in the state court, and her appearance may be compelled in that court by publication, but not here, for the reasons already stated in this opinion. Where a suit is brought in a federal court, and an indispensable party is out of the jurisdiction, it must be dismissed; but surely that is not to be the result of the attempted removal in this case; and yet I see no other, if the case has been already removed to this court. We must, *ex necessitate rei*, resort to the law of the state upon the subject of process against infant defendants, or this case cannot progress beyond the point it was at the time of the attempted removal, and this resort can only be had by remanding it to the state court for that purpose.

It has occurred to me that, inasmuch as the eighth section of the act of March 3, 1875, provides a substituted process by publication and notice to bring in absent defendants in certain exceptional cases where the suit is *commenced* in this court, we might apply it in this case, as it is of the character provided for, although it was not *commenced* but *removed* here, because the third section of the same act says that after a case has been removed here it shall proceed in the same manner as if it had been originally commenced here. But, on mature reflection, I am satisfied this is not a sound construction of the statute, and produces unnecessary confusion in the practice. These provisions for substituted process are not favored, and are nowhere more strictly construed than by the federal courts; and it would be a stretch of judicial power to permit it in removed causes, when the act providing it in terms confines it to those *commenced* in the federal courts. Again, while this would remove the difficulty as

to process against infant defendants in removed causes falling within the very exceptional circumstances provided for in the eighth section of the act of congress, it would leave all the others where we were before, and we would have one practice for infant parties to removed causes for one class of cases and another for all others. This introduces confusion into the practice, is an unsatisfactory and unnecessary result, and, in my judgment, not sustainable upon sound principles. It is the true rule to adopt a construction which covers all cases, and to require an infant defendant to be brought into the state court by proper proceedings for that purpose before permitting any removal in his behalf by any one authorized to make it. Until that time there is, I think, technically or strictly speaking, no suit against him to be removed. This removal was, if these views be correct, premature, and the cause should be remanded on that account.

This would dispose of this motion without a consideration of the question, so much argued, as to the citizenship of Maud B. McKenna, the infant defendant, who cannot, it is urged, have a separate citizenship from her father, who is, confessedly, a citizen of Tennessee. If this be so we could take no jurisdiction on account of difference of citizenship between the plaintiff and defendant. But as we could on account of the subject-matter, I would pass this perplexing question without the expression of any opinion, but for the fact that my judgment is not final, and it is proper that I should dispose of all the questions properly raised; and also it is proper, in view of any subsequent proceedings for removal. As it is, I shall do no more than intimate my judgment on that question, although I have given it a very careful consideration. I am satisfied that an infant child can acquire a separate citizenship or domicile from that of its father, if not for all purposes of nationality and change of *status* in its relations to the statutes of descents and distribution, certainly to the extent of acquiring a *forum*, broadly speaking, in the courts of the United States or of another state than that of which its father is a citizen. Or, as I may express it, for the purposes of judicial jurisdiction over the person, property, and right to sue and be sued of an infant, it may have a different citizenship from that of its father. It can acquire this only by that emancipation by the father which relinquishes his parental control over the subject. On principle I do not see why, if a father may of his own volition and arbitrarily change a child's domicile in all that the term implies, except, perhaps, that of its nationality, by simply changing his own domicile, he may not by other arbitrary acts do

the same. When we come to consider *how* and *by what acts* he may do this, the courts may, upon grounds of public policy and in the absence of legislation, see fit to confine the father to the act of changing his own domicile; or, when they come to consider what acts shall be taken as evidence that the father has exercised his power of changing the child's domicile, they may decline to consider any other than that of a change of his own domicile as conclusive. We find, when the jurists consider the right of a surviving mother or guardian to change any child's or ward's domicile, they, where the right is conceded, qualify it by confining it to cases free from any fraudulent purpose, such as changing the order of succession for their own benefit. The change will not be permitted to do this, while it may be effectual for other purposes. I do not, with the limited means at my command, find any trace of this qualification having been applied to the right of a father to change his child's domicile; but again I see no reason why it should not be so applied, whether we regard him as changing it by changing his own or by other means. This would meet the objections urged against the principle in argument, but really it is a question not of international law, as applicable to independent countries, but rather of municipal regulations by the states, to be governed by considerations of the peculiar comity that comes of the anomalous relations they bear to each other under our system of government. Whether the principle I have indicated exists, so that it has received recognition in all countries, is a question I am unable to answer; but it certainly does, or did, obtain in France. Whether it is recognized by the common law of England, or is otherwise there established, seems doubtful; though the right of emancipation so as to change the child's domicile in the matter of parish settlements, and the existence of that effect in all matters of domicile through the operation of the marriage of the infant, seems established. It cannot, then, in any view, be unqualifiedly said, as was maintained in argument, that it is a rule, without an exception, that a father cannot change the domicile of his child without changing his own, or that a minor child cannot acquire any different domicile from that of its father.

However these questions would have to be answered where there was an entire absence of legislation, or in international tribunals, there can be no doubt that our states, in their relation to each other, have control over the subject of emancipation of minors from parental control to the fullest extent, and that each may prescribe the rules to govern it and limit or extend its effects. Nothing was more

common, some years ago, than special acts of the legislatures emancipating minors from the disabilities of infancy, entirely or partially; and some states have general statutes on the subject. I have no doubt that, under our adoption laws in Tennessee, if a citizen of Kentucky should adopt the minor child of a citizen of Tennessee, that *ipso facto*, and by necessary implication, the child would become a citizen of Kentucky by the consent of the state of Tennessee, and that Kentucky would recognize the changed *status* of the child. Const. Tenn. art. 2. § 6; T. & S. Code (Tenn.) 3643–3645. So, if, under our Code, which says—

"A father * * * may, by deed executed in his life-time, or by last will and testament in writing from time to time, and in such manner and form as he thinks fit, dispose of, the custody and tuition of any legitimate child under the age of 21 years and unmarried, * * * during the minority of said child, or for a less time." T. & S. Code, § 2492.

—A deed or will should appoint a citizen of Kentucky such guardian, I have no doubt it would operate to make the child a citizen of Kentucky by necessary implication, whether it would or not for all purposes change the rule that the last domicile of the father constitutes the domicile of the child. And, perhaps, there would be the same result if the county court should bind an abandoned child to a citizen of another state. T. & S. Code, § 2549.

Why cannot a person have two domiciles—one for political citizenship, and another for purposes of succession? And, as I understand the subject, there is respectable authority that he may. The supreme court has held that, *ex necessitate rei*, a wife may acquire a different domicile from that of the husband, and the same necessity may sometime exist, I should think, in the case of a child. *Cheever* v. *Wilson*, 9 Wall. 108. I am aware that our courts have decided that there is a distinction between residence, however long-continued, and citizenship, in the purview of our constitution and laws, and that they apply substantially the same tests applied to determine questions of domicile in determining questions of citizenship; but I know of no case that holds that the person must denude himself so entirely of his former domicile in one state that the laws of *succession* in the new state must attach to him in order to constitute a change of *citizenship*, and on the principles laid down by the authorities I have consulted on the subject of two domiciles, I do not know why this most rigid test of domicile should be insisted on. I should, of course, concede that the person can have only one domicile or residence as pertaining to his inter state right of suing or being sued in the federal

courts; but it does not follow from this that when a conflict arises we must apply the test of the right of *succession* in determining the conflict, nor that the domicile of succession must be inevitably the one that settles this suable citizenship, if I may so call it. Simple residence is the usual test of the place to sue a man; and while I do not depart from the established doctrine that citizenship is something more than residence, I am not prepared to hold that it is nothing less than the domicile of succession.

I do not overlook the fact urged in argument that the fourteenth amendment to the constitution has declared that "all persons born or naturalized in the United States and subject to the jurisdiction thereof are citizens of the United States wherein they *reside*." Const. art. 14.

But I do not understand that this has enlarged the judicial power of the United States under article 3, § 2, so as to include controversies between persons who would be citizens of the same state, as theretofore understood, but who are now simply *residents* of different states, as contradistinguished from persons *domiciled* in different states. But we have the same tests of citizenship now as before the amendment. *Robertson* v. *Cease*, 97 U. S. 646, 649; *Nat. Bank* v. *Teal*, 5 FED. REP. 503, 505. I think these views will find support in the following authorities, and the cases cited by them: 2 Kent, (12th Ed.) 233, note *c*, 225, 226, note 1, (*d*,) 430, note 1, 431, 49, 71, 72; Schoul. Dom. Rel. part 3, *passim*, pp. 312, 412, 452, 442, 393, 394, 314, 367, 372, 591, 598; Story, Conf. L. (5th Ed.) *passim*, §§ 39, 49, § 46, and note 4, §§ 531, 543, § 480, *et seq.*, 492 *et seq.*; Phil. Dom. *passim*, c. 3, c. 7; Westl. Priv. Int. L. §§ 35, 36, 37, 34, 316; Whart. Conf. L. (2d Ed.) *passim*, §§ 8, 10, 10*a*, c. 2, *passim*, §§ 24, 29, 41–43, 55–66, 67–77, 81, 82, 396, 704, 720; Bump, Fed. Proc. 130, 185, 217; Dill. Rem. (2d Ed.) 67, and notes; *Somerville* v. *Somerville*, 5 Ves. 750, (Perkin's Ed.) and notes; *Allen* v. *Thomason*, 11 Humph. 535; *Cloud* v. *Hamilton*, Id. 104; *Ross* v. *Ross*, 129 Mass. 243; *Tirrell* v. *Bacon*, 3 FED. REP. 62; *Collinson* v. *Teal*, 4 Sawy. 241; *Holmes* v. *Railroad Co.* 5 FED. REP. 523, 526. And see 11 Cent. L. J. 421; 12 Cent. L. J. 51.

I do not treat this subject with a more exact and critical observation of the authorities, because, while I am inclined to think that an infant child may, at least to the extent of conferring the right to sue and be sued in the federal courts, with the consent of its father, acquire in the father's life-time such a domicile in another state than that of the father's domicile as will make it a citizen of that state, I

do not think, on the facts of this case, this defendant has acquired such a separate citizenship from her father. I find not the least trace of any principle upon which this result can be accomplished without the complete emancipation of the infant from the parental control of the father to that extent that there is conferred upon it the right to choose its own domicile, or upon some one else standing *in loco parentis* the right to choose one for it. The father can no more constitute a mere residence of his child a citizenship, than he can make his own mere residence a citizenship, under the rules of law regulating this federal jurisdiction over citizens of different states. The domicile of the child must be changed, whether so completely as to alter its *status* for all purposes or not, certainly so completely that it no longer depends upon the volition of the father to again change it. In *Tamworth* v. *New Market*, 3 N. H. 472, it was held that a child was not emancipated by a contract of the father that it should reside with a stranger till it was 21 years of age. He cannot by merely depositing his child in this or that state continue to change its domicile for any purpose without changing his own. He must relinguish and abandon his rights in that behalf to the child itself or another, or by operation of law the child's domicile will shift only with his own. The affidavit here shows only that he has placed his child to reside with friends in Kentucky—permanently, he thinks, judged by his own intention as it now exists, and that of the child and the friends with whom she resides, but *non constat* that he may not change that intention, resume his parental control of his own volition, or that these friends may not compel him to resume it by sending the child back to him. He shows that he has not released his parental authority, because he appeals to it to sustain his right to control this litigation, and has supplemented it by applying for a guardianship of her property. I have no doubt that after emancipation he might be guardian or next friend, as any other might, and natural father he must always be; but as long as he exercises his legal control *qua* father, or has the right to do so, his child's domicile must remain his own. I have no doubt, therefore, that Maud B. McKenna is a citizen of Tennessee, and for that reason, as well as others, on the record as it now stands, this cause must be remanded.

Remand the cause.