## PANNILL v. ROANOKE TIMES CO.

### JERRICK v. SAME.

(District Court, W. D. Virginia.   September 6, 1918.)

1. COURTS ⬥⬥307(1)—JURISDICTION OF FEDERAL COURTS—DIVERSE CITIZENSHIP —"CITIZEN."

Plaintiff, in suit against Virginia company in the Western district of Virginia, who, though not a "citizen" of Virginia, had left California with no intention to return to that state, and who had not acquired a domicile in any other state, could not maintain his suit on the ground of diversity of citizenship.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Citizen.]

2. DOMICILE ⬥⬥4(1)—DOMICILE OF CHOICE—LOSS.

A domicile of choice, once acquired, is not lost until a new domicile has been acquired.

3. DOMICILE ⬥⬥1—DISTINGUISHED FROM "CITIZENSHIP."

"Domicile" and "citizenship" are not always synonymous, though where domicile means home, and describes the state in which a citizen of the United States has his home, and to which he intends to return if absent, it is usually, if not always, equivalent to state citizenship; but when no new domicile has been acquired, and domicile exists only by legal fiction, and describes the former home state of a citizen of the United States to which he never intends to return, they are not synonymous.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Citizenship; Domicile.]

4. COURTS ⬥⬥307(1)—JURISDICTION OF FEDERAL COURTS—DIVERSITY OF CITIZENSHIP.

The grant of jurisdiction to the federal courts is not of controversies between citizens of the United States domiciled in different states, but of controversies between citizens of different states.

5. CITIZENS ⬥⬥2—WHO ARE—CITIZENSHIP.

Citizenship implies membership in a political society, the relation of allegiance and protection, identification with the state, and a participation in its functions, and while a temporary absence may suspend the relation between a state and its citizen, his identification with the state remains where he intends to return.

6. COURTS ⬥⬥307(1)—JURISDICTION OF FEDERAL COURTS—DIVERSITY OF CITIZENSHIP.

Grant of jurisdiction to the federal courts in controversies between citizens of different states does not include a mere homeless wanderer, a citizen of the United States, but not of any state.

7. COURTS ⬥⬥307(1)—JURISDICTION OF FEDERAL COURTS—DIVERSITY OF CITIZENSHIP—"CITIZEN."

The theoretical domicile, which is equivalent to state citizenship, is always one which exists animo revertendi, and such a domicile, clinging to a homeless wanderer, who never intends to return, is not equivalent to citizenship, in the sense in which the word "citizen" is used in the Judiciary Act.

⬥⬥For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

8. COURTS ⬳351½—FEDERAL COURTS—FOLLOWING STATE PRACTICE—NON-SUIT.

The state court practice should be followed, where the case is submitted to the jury, or where the jury has been waived. In the first event the plaintiff cannot take a nonsuit after the jury has retired, nor in the latter after the case has been submitted to the court for decision.

9. COURTS ⬳351½—FEDERAL COURTS—FOLLOWING STATE PRACTICE—NON-SUIT.

After a defendant's motion for a directed verdict a plaintiff has no absolute right to then suffer a nonsuit; the state statute (Code Va. 1904, § 3387) against taking a nonsuit after the jury retires not governing, in view of the accepted Virginia practice (Hurst's Code Va. 1913, § 3384b; Acts 1912, p. 52) not to direct verdicts.

10. COURTS ⬳351½—FEDERAL COURTS—ABSENCE OF STATE PRACTICE.

Where there is no state practice as to the granting of a nonsuit, the federal courts of the state are governed only by the general law.

11. DISMISSAL AND NONSUIT ⬳15—DISCRETION OF COURT.

From the time of the submission of a motion to instruct a verdict, the granting of a nonsuit lies wholly in the discretion of the court.

12. DISMISSAL AND NONSUIT ⬳12—GROUNDS—SURPRISE.

Where defendant's introduction of evidence offered practically at the close of the trial was a surprise to plaintiff, and he had no opportunity to investigate it, or to seek to rebut it, the court might grant a nonsuit.

13. DISMISSAL AND NONSUIT ⬳30—ELECTION.

The court may require plaintiff to make an election whether he will suffer a voluntary nonsuit before indicating its views on defendant's motion for a directed verdict.

14. DISMISSAL AND NONSUIT ⬳30—ELECTION—MOTION TO DIRECT VERDICT.

A plaintiff should not be allowed to first ascertain the court's conclusion on defendant's motion to direct a verdict, and thereafter have the unfair advantage of taking a nonsuit, if the court intends to sustain the motion, and of submitting the case to the jury, if the court intends to overrule it.

At Law. Actions by one Pannill and by one Jerrick against the Roanoke Times Company, consolidated for trial. Action by plaintiff Pannill dismissed for want of jurisdiction, and plaintiff Jerrick permitted to take a voluntary nonsuit.

Holman Willis, of Roanoke, Va., for plaintiffs.
Waller R. Staples, of Roanoke, Va., for defendant.

McDOWELL, District Judge. 1. These actions for libel were consolidated for trial, without objection from any party, as both cases grew out of the same publication. The first case was, after some of the plaintiffs' evidence had been heard, dismissed without prejudice for want of diversity of citizenship, which ruling was excepted to by both Pannill and the defendant. The defendant is a corporation created by the state of Virginia. The plaintiff was born in West Virginia, and in his early manhood went to Oklahoma, where he bought a farm near Lawton, and was living there with the intention of residing in that state permanently. In 1910 he met with an accident which resulted in almost entire paralysis. His own means were shortly exhausted in efforts to be cured, and as he was and had been before his injury a member of the Lawton local lodge of Elks, he applied through his local

lodge to the Grand Lodge of Elks for assistance. It developed that the Grand Lodge had no fund applicable to the relief of any but super-annuated members, and Pannill is even now apparently under 40 years of age. He then undertook to visit a number of the local lodges of Elks in several of the Western states in an effort to have them send delegates to the next Grand Lodge convention instructed to have a fund created for the assistance of members in his condition. In undertaking this journey, according to his own evidence, Pannill left Oklahoma with no intention of returning to that state, but with the expectation of living in California if he succeeded in his endeavor. The result of this campaign was temporarily successful. The Grand Lodge agreed to pay a certain sum monthly for Pannill's support, on condition that the Lawton lodge would also pay a specified part of the expense. This arrangement having been made, Pannill went to California, intending to stay there, as he said, "for the remainder of my life."

Some few months after Pannill had established himself in California, the Lawton lodge found itself unable to raise from its few members the share of the expenses it had undertaken to contribute, which resulted in a refusal by the Grand Lodge to continue its contributions. Thereupon Pannill left California and commenced a tour of the United States in an effort to induce the Elks to establish a fund for his support without reference to contributions from the Lawton lodge, which had surrendered its charter. Pannill testified that when he left California he had the intention of never returning to that state at any time, and all the facts adduced substantiated this statement. His intention was, if successful in his quest, to take up his abode in Florida or Texas. He had no plans based on the possibility of entire want of success of this last campaign among the Elks. He left California in 1915, and had been traveling since then, making short stops in many cities and towns, and had covered about 40,000 miles. The expenses of Pannill and his nurse had been mainly obtained from local lodges of Elks, from individual members of that order, and in some cases transportation had been obtained from other charitable organizations. The plaintiffs had come to Virginia a few weeks before these actions were instituted, not intending to stay permanently, but only to stay long enough to institute, and possibly to bring to a conclusion, a suit by Pannill against the Grand Lodge on what he conceives to be a valid cause of action against that body.

As has been said, Pannill's Case was ordered dismissed for want of jurisdiction. As the term at which the order of dismissal was made has not been brought to an end, and as the question of Pannill's citizenship is to me novel and rather perplexing, I have taken advantage of the first opportunity to give it further consideration.

[1] (a) It would seem that Pannill cannot be regarded as a citizen of Virginia. He was at the institution of this action residing in this state, but with no intention of remaining here permanently. His intent was and is to stay here only long enough to finish the business which brought him here and to then go to some other state. As Virginia is not the state of his birth, as his residence here is not animo

manendi, I cannot satisfactorily class him as a citizen of this state. It is true that he is not here with intent to return to either California or to West Virginia, and he intends to stay here for a somewhat indefinite time. But the fact which is necessary to convert mere residence into citizenship is the intent to remain permanently.

[2] (b) It is, I take it, entirely settled that a domicile of choice, once acquired, is not lost until a new domicile has been acquired. Story, Conflict of Laws (2d Ed.) § 47; Wharton, Confl. of Laws (2d Ed.) § 55; 14 Cyc. 851; Mitchell v. United States, 21 Wall. 350, 352, 353, 22 L. Ed. 584; Desmare v. United States, 93 U. S. 605, 610, 23 L. Ed. 959.

[3] If ascertaining the domicile of a citizen of the United States always ascertains his state citizenship, we have arrived at a simple solution of the question before us. However, domicile and citizenship are, as I think, not always synonymous. Where domicile means home, where it describes the state in which a citizen of the United States has his home, or what he regards as his home, and to which he intends to return, if absent therefrom, it is usually, if not always, equivalent to state citizenship. But when (no new domicile in fact having been acquired) domicile exists only by legal fiction, and describes the state in which a citizen of the United States once had his home, but to which he intends never to return, I cannot see that domicile and citizenship are synonymous. It has in some cases been said that domicile is synonymous with state citizenship. But in every case in which this has been said, so far as I have found, the court had in mind a domicile, to which the party, if absent therefrom, intended ultimately to return. In Williamson v. Osenton, 232 U. S. 619, 624, 34 Sup. Ct. 442, 58 L. Ed. 758, the agreed facts, as construed by the court (232 U. S. 624, 625, 34 Sup. Ct. 442, 58 L. Ed. 758), showed an actual domicile in Virginia—a residence with intent to remain permanently. In Prentiss v. Barton, Fed. Cas. No. 11384, Chief Justice Marshall said:

"In the sense of the Constitution and of the Judicial Act, he who is incorporated into the body of the state, by permanent residence therein, so as to become a member of it, must be a citizen of that state, although born in another. Or, to use the phrase more familiar in the books, a citizen of the United States must be a citizen of that state in which his domicile is placed."

But here, also, the court was dealing with a case of actual domicile and an intent to return to it. In Collins v. City of Ashland (D. C.) 112 Fed. 175, 177, it is said that "citizenship depends upon domicile." But in that case the evidence showed a domicile in Ohio, a merely temporary residence in Kentucky, and a clear intent to return to Ohio. In Harding v. Standard Oil Co. (C. C.) 182 Fed. 421, 426, it is said that domicile is usually coextensive in meaning with citizenship; but in this case also (pages 428 and 430) the court finds that the plaintiff, after his departure from Illinois, always had the intention to return to that state, and consequently the case is not one in which, as in the case at bar, the departure from the state of domicile was with intent never to return there. In Hammerstein v. Lyne (D. C.) 200 Fed. 165, 170, it is said that state citizenship is the practical equivalent of domicile. But here again the court had in view an actual domicile animo revertendi.

[4, 5] It must be borne in mind that the grant of jurisdiction to the federal courts is not of controversies between citizens of the United States domiciled in different states, but of controversies between citizens of different states. Beyond any doubt a question of domicile (in fact) is often determinative of the question of citizenship (Morris v. Gilmer, 129 U. S. 315, 328, 9 Sup. Ct. 289, 32 L. Ed. 690); but it is a very different thing to assert that a mere theoretical domicile, existing with intent never to return to it, is the same thing as citizenship. In the case before us the plaintiff at the institution of the suit did not reside in California, he had no place of abode there, and he intended never to return there. Assuredly it is very difficult to reconcile any theory of citizenship or any definition of the word "citizen" with such facts. Citizenship implies membership in a political society, the relation of allegiance and protection, identification with the state, and a participation in its functions. While a temporary absence may suspend the relation between a state and its citizen, the latter's identification with the former remains because of his intention to return. If A., a citizen of California, sells his home and with his family takes up his residence in Virginia, for a temporary purpose, intending to return to California, he undoubtedly retains his domicile and citizenship in California; and his case may bear close resemblance to the case at bar. A. may also be said to have only a theoretical domicile in California. But the essential difference between A.'s status and that of Pannill is that A. intends to return to California and Pannill does not; California is A.'s home, and it is not in any sense Pannill's home. A. has only temporarily surrendered his membership in the political society of California and his participation in its functions; while Pannill has permanently ended his connection with that state.

[6] It is true that a citizen of the United States, who is a mere homeless wanderer and not a citizen of any state, would encounter the same risk of local prejudice in the state courts that would be encountered by citizens of other states. But so would citizens of the District of Columbia. The latter are not included in the grant of jurisdiction, and the most satisfactory conclusion I can reach is that Pannill is not included. In both cases the exclusion is due simply to the wording of the grant. Its language is not broad enough to include a citizen of the District of Columbia or a citizen of the United States who is not a citizen of any state. In Prentiss v. Brennan, 2 Blatchf. 162, 19 Fed. Cas. 1279, 1280, Mr. Justice Nelson said:

"A person may be a citizen of the United States, and not a citizen of any particular state. This is the condition of citizens residing in the District of Columbia, and in the territories of the United States, or who have taken up a residence abroad, and others that might be mentioned. A fixed and permanent residence or domicile in a state is essential to the character of citizenship that will bring the case within the jurisdiction of the federal courts."

[7] As has been said, citizens of the District of Columbia were not granted the privilege of litigating in the federal courts on the ground of diversity of citizenship. Possibly no better reason for this fact exists than that such citizens were not thought of when the judiciary article of the federal Constitution was drafted. It is even more

probable that citizens of the United States, occupying the very unusual status that Pannill does, were also not thought of; but in any event a citizen of the United States, who is not a citizen of any state, is not within the language of the Constitution.   And to my mind Pannill is not a citizen of California, simply because he never intends to return to that state, and has finally severed his connection with that state.    The theoretical domicile which is equivalent to state citizenship is always one which exists animo revertendi.    The theoretical domicile which clings to a homeless wanderer, who never intends to return, has its uses in deciding rights of succession to property, in respect to taxation and to the administration of pauper laws, but is not, I think, equivalent to citizenship in the sense in which the word "citizen" is used in the Judiciary Act.   While domicile, in some sense, may not be lost by mere departure with intent not to return, state citizenship is thus lost.   In other words, where the word "domicile" is used as meaning home, where absence from domicile is animo revertendi, domicile may be equivalent to state citizenship; but where domicile exists merely by legal fiction, and absence is accompanied by intent never to return to the state of domicile, the word is not synonymous with citizenship.

2. The Pannill Case having been dismissed for want of jurisdiction, the trial of the Jerrick Case proceeded until all the evidence was in.   At this juncture defendant moved for a directed verdict. When this motion was submitted, and before giving any intimation as to my decision thereon, I required plaintiff's counsel to then elect whether he would or would not suffer a voluntary nonsuit.   He elected to suffer a nonsuit.   Thereupon counsel for defendant excepted to the ruling permitting the plaintiff to then take a nonsuit.

[8-11] In cases tried by a jury, which reach the point where the jury retires to consider its verdict, I see no reason why this court should not follow the state statute.   Section 3387, Code 1904.   So, too, in cases in which by stipulation a jury is waived, I think the state practice should be followed, and that a motion for leave to suffer a nonsuit after the case has been submitted to the judge for decision comes too late.   Harrison v. Clemens, 112 Va. 371, 373, 71 S. E. 538.   However, a motion for a directed verdict creates a very different situation.

(a) I have very little hesitation in holding that a plaintiff, after a motion by the defendant for a directed verdict has been submitted, has no absolute right to then suffer a nonsuit.   The Virginia statute (section 3387, Code 1904), providing that "a party shall not be allowed to suffer a nonsuit, unless he do so before the jury retire from the bar," does not seem to me to govern here, because it has never been the accepted Virginia practice to direct verdicts (section 3384b, Hurst's Code Va. 1913; Acts 1912, p. 52; Taylor v. B. & O. R. Co., 108 Va. 817, 819, 62 S. E. 798; Hargrave v. Shaw Land Co., 111 Va. 84, 90, 68 S. E. 278, Ann. Cas. 1912A, 151).   Consequently the statute, which has been in force since 1788 (12 Henning's St. at Large, 749; 1 Shepherd's St. at Large, 33; 1 Code 1819, p. 510; 1 Code 1849, p. 672; Code 1887, § 3387), never contemplated, and does not apply

to, a case where a motion to direct a verdict has been submitted. For the same reason there is no state court practice on the point. It follows that the federal courts in this state, in the situation which arose here, are governed only by the general law. In this circuit the case of Parks v. Southern R. Co., 143 Fed. 276, 279, 74 C. C. A. 414, 417, is of controlling authority. It is there said:

"From the time of the submission of the motion to instruct a verdict the granting of a nonsuit lies wholly in the discretion of the court."

This ruling (see, also, Francisco v. Chicago & A. R. Co., 149 Fed. 354, 359, 79 C. C. A. 292, 9 Ann. Cas. 628), while not followed in some of the other circuits (Meyer v. National Biscuit Co., 168 Fed. 906, 94 C. C. A. 335; Knight v. Illinois Cent. R. Co., 180 Fed. 368, 373, 103 C. C. A. 514), requires the conclusion in this court that the plaintiff had no absolute right to a nonsuit, and also that there was a discretionary power in the court to grant the nonsuit.

[12] (b) As there was a discretionary power to grant the nonsuit, it may be well to state why it was exercised in favor of the plaintiff. The evidence of the defendant's managing editor, to the effect that he had ordered the suppression of the article concerning the plaintiffs, and that it was published by mistake as the result of an error in the composing room, was to me a complete surprise. There had been no previous intimation that the defendant would, practically at the close of the trial, introduce such evidence. At the time I granted the nonsuit I supposed, and I still suppose, that this evidence was as surprising to the plaintiff and her counsel as it was to me. Plaintiff had had no sort of opportunity to investigate the accuracy of this testimony, or to seek to rebut it. The best possible reason for taking a nonsuit is that evidence offered by the defendant has taken the plaintiff by surprise, and such a situation must likewise afford the best possible reason for a court to permit a nonsuit. If, after opportunity to investigate the facts, it is ascertained that the evidence of the editor cannot be rebutted, the plaintiff is very unlikely to bring another action. But, if there is rebuttal evidence in existence, the plaintiff assuredly ought to have the opportunity of producing it.

[13, 14] (c) The right of the court to require the plaintiff to make election before indicating its views on the motion to direct a verdict is also settled in the affirmative by the opinion in Parks v. Southern R. Co., supra, 143 Fed. 276, 279, 74 C. C. A. 414, 417:

"The plaintiff upon the making of a motion to instruct a verdict against him * * * should then elect whether or not he will take a nonsuit. * * *"

See, also, upholding the right of the court to refuse to allow a nonsuit after announcing its conclusion to direct a verdict, Huntt v. McNamee, 141 Fed. 293, 72 C. C. A. 441 (C. C. A. 4th Circuit); Barrett v. Virginian R. Co., 244 Fed. 397, 157 C. C. A. 23 (C. C. A. 4th Circuit).

And, independent of authority, the ruling made was dictated by considerations of fairness. A plaintiff should not, in circumstances

such as existed here, be allowed to first ascertain the conclusion of the court on the motion to direct a verdict, and thereafter have the unfair advantage of taking a nonsuit if the court intends to sustain the motion, and of submitting the case to the jury if the court intends to overrule the motion. The very object of the state statutes (found in the laws of nearly all the states) limiting the time for taking a voluntary nonsuit is to prevent just this unfairness to the defendant.

---

⬅For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes