**Orville E. STIFEL, II, Plaintiff-Appellant,**

v.

**William F. HOPKINS, Esq., et al., Defendants-Appellees.**

**No. 72–1424.**

United States Court of Appeals, Sixth Circuit.

Submitted Oct. 3, 1972.

Decided May 1, 1973.

Orville E. Stifel, II, pro se.

Lindhorst & Dreidame by James L. O'Connell, Cincinnati, Ohio, for defendant-appellee, William F. Hopkins.

Before PHILLIPS, Chief Judge, and EDWARDS and McCREE, Circuit Judges.

McCREE, Circuit Judge.

This case presents the question whether a federal prisoner who is incarcerated in a state other than the state of his domicile prior to conviction can show that he is a citizen of the state of incarceration for purposes of federal diversity jurisdiction. The District Court held that as a matter of law the prisoner was precluded from making this showing, and dismissed the complaint for lack of jurisdiction. We reverse.

In 1969, appellant was convicted by a jury of violating 18 U.S.C. § 1716 (1970), by mailing an "infernal machine" that exploded and caused the death of the addressee upon opening the package. Appellant's conviction was subsequently affirmed by this court. United States v. Stifel, 433 F.2d 431 (6th Cir. 1970), cert. denied, 401 U.S. 994, 91 S.Ct. 1232, 28 L.Ed.2d 531 (1971), and he is now serving a life sentence in the federal penitentiary in Lewisburg, Pennsylvania. Prior to his arrest and conviction, appellant lived with his parents in Cincinnati, Ohio, and concededly was a citizen of Ohio. As we recognized in our consideration of his prior appeal, he was known in his community "as something approaching a model young man." 433 F.2d at 431.

In 1971, following the denial of certiorari by the Supreme Court in appellant's criminal case, he instituted this action against his parents and against the attorney who represented him throughout the criminal proceedings. Reciting that

plaintiff was a citizen of Pennsylvania, that defendants were citizens of Ohio, and that the amount in controversy exceeded $10,000, the complaint, which was filed in United States District Court for the Southern District of Ohio, invoked the diversity jurisdiction of the court. The complaint asserted that the attorney had fraudulently induced plaintiff to retain him and had deliberately and negligently engaged in acts of professional misconduct to the detriment of plaintiff; that plaintiff's parents had agreed to pay the attorney a large sum of money for representation of their son and then obtained a judgment in federal court against plaintiff in the amount of their debt to the attorney; and that plaintiff was entitled to compensatory and punitive damages from the attorney and to injunctive relief against the payment of any moneys by plaintiff's parents to the attorney.

Defendant attorney moved to dismiss the complaint pursuant to Fed.R.Civ.P. 12(b)(1) for lack of subject matter jurisdiction. In support of this motion, he submitted an affidavit stating that plaintiff resided with his parents in Ohio until he was incarcerated in federal prison in Pennsylvania and that Stifel was in prison at the time of suit. Plaintiff filed a counter-affidavit in which he stated that he was 25 years of age, unmarried, and childless; that from July 1969 he had resided in Pennsylvania and would continue to do so indefinitely; that all his personal belongings and assets were in Pennsylvania and that all his business transactions were conducted in Pennsylvania; that, because of the actions of his attorney as set out in the complaint, he had been subject to public scorn and ridicule in Ohio, had become a "notorious person" there, and was a "target of great public hostility" in his former community, and that he therefore did not intend ever to return to Ohio. He stated that he considered Pennsylvania his home and intended to remain there indefinitely. Plaintiff subsequently submitted a supplemental memorandum in which he asserted that federal prisoners have some choice of the particular prison facility in which they will be incarcerated and that transfers are often allowed, and he contended that he had decided to remain in Pennsylvania despite urgings by unnamed prison officials that he transfer to a facility in Indiana.

The District Court granted the motion to dismiss. The court accorded no weight to appellant's affidavit on the ground that appellant was not voluntarily in Pennsylvania and his intentions regarding his domicile if and when he should be released from prison were irrelevant. Appellant's domicile, the court held, remained in Ohio until appellant should have voluntarily changed it, and a prisoner cannot perform such a voluntary act because he is at all time subject to the physical and legal compulsion of federal authorities.[1]

On appeal, plaintiff contends that a rule of law that precludes a prisoner from showing that he has changed his domicile and thereby denies him access to federal court is a rule that is based solely on the litigant's status as a prisoner, and as such violates the due process clause of the Fifth Amendment. He contends that it works arbitrarily to discriminate against prisoners and to deprive them of an important federal right —the right to sue in federal court. He claims that the rule constitutes an irrebuttable presumption in violation of the Fifth Amendment, that it restrains his First Amendment right to form and express his thoughts, and that it places unjustifiable obstacles in the path of prisoner-litigants that would not have to be overcome by unconfined citizens.

We agree with appellant that the District Court should not have ruled as a

---

1. The court observed that the judgment obtained by plaintiff's father against plaintiff in the United States District Court for the Southern District of Ohio could not avail plaintiff in this proceeding because that judgment was void for lack of jurisdiction.

matter of law that appellant could not make the requisite showing of a change of domicile. We reach this result not on constitutional grounds but instead on the basis of our interpretation of the meaning of the word "citizen" in the statute defining the diversity jurisdiction of the federal courts.

■ Federal district courts have diversity jurisdiction of civil actions between "citizens of different states" if the amount in controversy exceeds $10,000. 28 U.S.C. § 1332(a)(1) (1970). The determination of a litigant's state citizenship for purposes of diversity jurisdiction is a matter of federal law, Ziady v. Curley, 396 F.2d 873, 874 (4th Cir. 1968); Taylor v. Milam, 89 F.Supp. 880, 883 (W.D.Ark.1950); see 1 J. Moore, Federal Practice (pt. 1) ¶ 0.74 [1], at 707.1 (2d ed. 1972), although federal courts may look to state law for guidance in defining terms, formulating concepts, or delineating policies. See Napletana v. Hillsdale College, 385 F.2d 871, 872 (6th Cir. 1967). Thus, although it is settled that citizenship for purposes of 28 U.S.C. § 1332(a) means domicile rather than residence, Gilbert v. David, 235 U.S. 561, 569, 35 S.Ct. 164, 59 L.Ed. 360 (1915); Williamson v. Osenton, 232 U.S. 619, 624, 34 S.Ct. 442, 58 L.Ed. 758 (1914); see D. Currie, Federal Courts 250 (1968); 1 J. Moore, *supra*, ¶ 0.74 [3], considerations on which federal courts rely in determining domicile often derive from state choice-of-law rules that have been developed in such diverse contexts as probate jurisdiction, taxation of incomes or intangibles, or divorce law. See 1 J. Moore, supra, ¶ 0.74 [3.–1], at 707.53; C. Wright, Law of Federal Courts § 26, at 86 n. 4 (2d ed. 1970); Restatement (Second) of Conflict of Laws § 11, comment *o* (1971); *cf.* Note, Evidentiary Factors in the Determination of Domicile, 61 Harv.L.Rev. 1232, 1233–34 (1948). Although this importation of the law of conflicts into resolution of federal jurisdictional questions can have the unfortunate consequence of causing federal courts to lose sight of important federal interests that may be involved, conflicts law is useful in providing basic working definitions. *But see* Currie, The Federal Courts and the American Law Institute (pt. 1), 36 U.Chi.L.Rev. 1, 10–12 (1968).

■ To acquire a domicile within a particular state, a person must be physically present in the state and must have either the intention to make his home there indefinitely or the absence of an intention to make his home elsewhere. Gilbert v. David, *supra*, 235 U.S. at 569–570, 35 S.Ct. 164; Gallagher v. Philadelphia Transp. Co., 185 F.2d 543, 546–547 (3d Cir. 1950); see 1 J. Moore, *supra*, ¶ 0.74 [3.–1]; C. Wright, *supra*, § 26. A threshold inquiry, then, is whether a person has the legal capacity to form the intention to abide where he resides. Although in a federal diversity case the capacity of a person to sue or be sued is to be determined by the law of the state of the litigant's domicile, Fed.R.Civ.P. 17(b), and although state law may define certain concepts or relations that bear on the question of a litigant's disability to perform particular acts, *see* Spurgeon v. Mission State Bank, 151 F.2d 702 (8th Cir. 1945), cert. denied, 327 U.S. 782, 66 S.Ct. 682, 90 L.Ed. 1009 (1946), the determination in a diversity case whether a litigant can acquire citizenship in a particular state is a federal question to be resolved in accordance with federal principles. *Cf.* O'Brien v. Avco Corp., 425 F.2d 1030, 1034 (2d Cir. 1969); Ziady v. Curley, *supra*; Napletana v. Hillsdale College, *supra*.

If appellant is not legally capable of establishing a domicile in Pennsylvania, it must be either because he is in Pennsylvania under compulsion and for that reason cannot, as a matter of law, form the intent to make the state his home, or because he is under a civil disability resulting from his status as an inmate of a federal prison. We will consider each of these possible reasons in turn.

I

In his essay on the subject of domicile in 1830, Joseph Story stated the rule to be that "[r]esidence in a place by constraint, or involuntarily, will not give the party a domicile there; but his antecedent domicile remains." Hogan, Joseph Story's Essay on "Domicile," 35 B. U.L.Rev. 215, 221 (1955). It has since become black-letter law that a person cannot acquire a domicile of choice in a place if he is there by virtue of physical or legal compulsion. *See, e. g.,* Neuberger v. United States, 13 F.2d 541, 542 (2d Cir. 1926); Shaffer v. Tepper, 127 F.Supp. 892, 894 (E.D.Ky.1955); Wendel v. Hoffman, 24 F.Supp. 63, 64–65 (D.N.J.1938); 1 J. Beale, The Conflict of Laws § 21.1 (1935); 1 J. Moore, *supra,* ¶ 0.74 [3.–3], at 707.67; Restatement (Second) of Conflict of Laws, *supra,* § 17; Note, Domicile as Affected by Compulsion, 13 U.Pitt.L.Rev. 697, 699 (1952); Recent Decision, 26 Mich.L. Rev. 571, 572 (1928). The rule has been applied, in a variety of contexts, to political refugees, *see* White v. Burnley, 20 How. (61 U.S.) 235, 248–249, 15 L.Ed. 886 (1858),; to persons living in forced exile, *see* Neuberger v. United States, *supra; cf.* Guessefeldt v. McGrath, 89 F.Supp. 344, 347 (D.D.C.1950), aff'd, 88 U.S.App.D.C. 383, 191 F.2d 639 (1951), rev'd on other grounds, 342 U.S. 308, 72 S.Ct. 338, 96 L.Ed. 342 (1952); to evacuees, *see* Hiramatsu v. Phillips, 50 F. Supp. 167 (S.D.Cal.1943), *noted in* 42 Mich.L.Rev. 321 (1943); and to servicemen, *see* Kinsel v. Pickens, 25 F.Supp. 455 (W.D.Texas 1938); Radford v. Radford, 26 Ky.Law Rep. 652, 82 S.W. 391 (1904). It has also been consistently applied to inmates of penal institutions. *See* Cohen v. United States, 297 F.2d 760, 774 (9th Cir.), cert. denied, 369 U. S. 865, 82 S.Ct. 1029, 8 L.Ed.2d 84 (1962) (mailing of notice of tax deficiency); United States v. Stabler, 169 F.2d 995, 998 (3d Cir. 1948) (venue for cancellation of citizenship); White v. Fawcett Publications, 324 F.Supp. 403, 404 (W.D.Mo.1970) (diversity of citizenship); Urbano v. News Syndicate Company, 232 F.Supp. 237, 239 n. 1 (S.D.N. Y.1964), rev'd on other grounds, 358 F. 2d 145 (2d Cir. 1965), cert. denied, 385 U.S. 831, 87 S.Ct. 68, 17 L.Ed.2d 66 (1966) (capacity to sue); Shaffer v. Tepper, 127 F.Supp. 892, 894–95 (E.D. Ky.1955) (diversity of citizenship); Ferguson's Adm'r v. Ferguson's Adm'r, 255 Ky. 230, 73 S.W.2d 31 (1934) (jurisdiction to appoint administrator of estate); People v. Cady, 143 N.Y. 100, 37 N.E. 673 (1894) (voting residence); Anno., 132 A.L.R. 509, 510 (1941) (venue); Restatement (Second) of Conflict of Laws, *supra,* § 17 comment *c*; 1 J. Beale, *supra,* § 21.3, at 158–59; *cf.* Ott v. Ciccone, 326 F.Supp. 609, 613 & n. 3 (W.D.Mo.1970); Wendel v. Hoffman, 24 F.Supp. 63 (D.N.J.1938). As one commentator has observed, this rule

> was doubtless designed to help persons who presumably would prefer to retain their old domicile in spite of enforced presence elsewhere. It is also based on the proposition that, if a person is forced to do a certain act, he cannot at the same time be doing the thing of his own free will. Intent, which is of its very nature voluntary cannot co-exist with compulsion.

Note, Domicile as Affected by Compulsion, *supra,* 13 U.Pitt.L.Rev. at 699. *See also* 1 J. Beale, *supra,* § 21.1, at 154; Recent Decision, 26 Mich.L.Rev. 571, 572 (1928).

As an abstract proposition, the rule is unassailable. It makes eminent good sense to say as a matter of law that one who is in a place solely by virtue of superior force exerted by another should not be held to have abandoned his former domicile. The rule shields an unwilling sojourner from the loss of rights and privileges incident to his citizenship in a particular place, such as, for example, paying resident tuition at a local university, invoking the jurisdiction of the local divorce courts, or voting in local elections.

However, in practice this salutary principle has hardened into a *per se* rule that prevents any prisoner from ever ef-

fecting a change of domicile, although at the same time it will yield with respect to persons in other situations when its application would produce illogical or socially undesirable results. *See generally* Comment, Domicile of Choice—Fixed Rules, 36 Yale L.J. 408, 410–12 (1927). In fact, prisoners appear to be the only persons who may never be able to escape the rule even though there are many other classes of individuals that are subject to compulsion similar to that experienced by prisoners but have been permitted to attempt to show a change of domicile to the place of their enforced presence.

■ The most obvious example is the serviceman. It has long been the rule that presence at his military station, without more, cannot make the station his domicile because a serviceman is subject to the orders of his superior officer. *See, e. g.,* Deese v. Hundley, 232 F.Supp. 848, 850 (W.D.S.C.1954); Kinsel v. Pickens, 25 F.Supp. 455 (W.D. Tex.1938); Radford v. Radford, *supra*; 1 J. Moore, *supra*, ¶ 0.74 [6.–4], at 708.-62; Anno., 21 A.L.R.2d 1163, 1168 (1952); Anno., 148 A.L.R. 1413, 1414 (1944). A corollary of this rule is that a serviceman who lives on the military base, even if his family is living on-base with him, cannot establish a domicile at the base. *E. g.,* Deese v. Hundley, *supra*; Harris v. Harris, 205 Iowa 108, 215 N.W. 661 (1927); *see* Anno., *supra*, 21 A.L.R.2d at 1173–75; 1 J. Moore, *supra*, ¶ 0.74 [6.–4], at 708.63; Restatement (Second) of Conflict of Laws, *supra*, § 17 comment *d*. The reason usually assigned in support of this rule is that a serviceman has no free choice in the decision that he live on base: whether or not he wishes to live on-base, his commanding officer makes the decision that he will be allowed, or required, as the case may be, to reside in quarters on the base. *See* Harris v. Harris, *supra*; 1 J. Beale, *supra*, § 21.2.

■ However, the serviceman is not precluded as a matter of law from showing that he has established a domicile different from the one he had before he entered military service. Although the standard of proof is variously stated, a serviceman who lives off-base will be regarded as a domiciliary of the place of his residence if the circumstances surrounding his acquisition of an off-base residence unmistakably indicate an intention on his part to abandon his former domicile and adopt a new one. *E. g.,* Ellis v. Southeast Construction Co., 260 F.2d 280 (8th Cir. 1958); Ferrara v. Ibach, 285 F.Supp. 1017 (D.S.C.1968); Deese v. Hundley, *supra; see* Anno., *supra*, 148 A.L.R. at 1415–17; Anno., *supra*, 21 A.L.R.2d at 1167–79; 1 J. Moore, *supra*, ¶ 0.74 [6.–4], at 708.63–.64; Restatement (Second) of Conflict of Laws, *supra*, § 17 comment *d*. Illustrative indicia of intent include affidavits of intention, transfer requests, registration for driver's licenses, opening bank accounts, addressing tax returns, motive for establishing domicile, and other physical facts evidencing that the desire to remain will not expire when the order requiring presence does. *See* authorities collected in Annos., *supra*, 148 A.L.R. 1413, 21 A.L.R.2d 1163; 1 J. Moore, *supra*, ¶ 0.74 [6.–4]; Restatement (Second) of Conflict of Laws, *supra*, § 17 comment *d*; Thames, Domicile of Servicemen, 34 Miss.L.J. 160 (1963); Note, Domicile of Members of Armed Forces, 26 Tenn.L.Rev. 415 (1959); *see generally* Note, Evidentiary Factors in the Determination of Domicile, 61 Harv.L.Rev. 1232, 1235–40 (1948).

Indeed, the distinction between on-post and off-post residence, for purposes of applying a *per se* rule, has been criticized as an "artificial" distinction that substitutes a difference of physical fact for one of intention. Note, Domicile as Affected by Compulsion, 13 U.Pitt.L. Rev. 697, 700 (1952). It might also be observed that a serviceman who lives off-base does so only by permission of his superior officers, and thus, although the fact of his living off-base may lend substance to a claimed intention, it can hardly be distinguished in terms of the

exercise of volition from the situation of the serviceman who is allowed to live on-base at the pleasure of his commander. *Compare* 1 J. Beale, *supra*, § 21.2. And, military personnel have a much greater voice in the location of their duty stations today than was true in the past. *See* Thames, *supra*, 34 Miss.L.J. at 165–72; Note, *supra*, 13 U.Pitt.L.Rev. at 700, 710; Recent Case, 13 Iowa L. Rev. 347, 348 (1928). This proposition has found some support in the cases. *See; e. g.*, Volmer v. Volmer, 231 Or. 57, 371 P.2d 70 (1962); Thomas v. Thomas, 58 Wash.2d 377, 363 P.2d 107 (1961); Percy v. Percy, 188 Cal. 765, 207 P. 369 (1922).

■ The civilian counterpart of the serviceman—the officer or employee of the federal government who must change his residence upon assuming his duties—may establish a domicile at his new residence. *See* District of Columbia v. Murphy, 314 U.S. 441, 62 S.Ct. 303, 86 L.Ed. 329 (1941); Anno., 129 A.L.R. 1382, 1396–1401 (1940). This is the rule generally with respect to holders of public office or public employees. *See* Restatement (Second) of Conflict of Laws, *supra*, § 17 comment *h*; Anno., *supra*, 129 A.L.R. at 1392–1404.

■ Inmates of institutions other than prisons can show that they have become domiciled within institutional confines even if they have been compelled by circumstances beyond their control to become institutionalized. *See, e. g.*, Sealey v. United States, 7 F.Supp. 434, 437 (E.D.Va.1934) (old-soldier's home); Sturgeon v. Korte, 34 Ohio St. 525 (1879) (charitable hospital); Restatement (Second) of Conflict of Laws, *supra*, § 17 comment *e* (paupers); *cf.* Coppedge v. Clinton, 72 F.2d 531 (10th Cir. 1934) (mental incompetents).

■ Refugees or fugitives, who leave their homes because of unhappiness with existing political conditions, fear of physical harm, or apprehension of prosecution, can establish domiciles within the jurisdictions in which they seek asylum. *See* Ennis v. Smith, 14 How. (55 U.S.) 399, 423–424, 14 L.Ed. 472 (1853); Restatement (Second) of Conflict of Laws, *supra*, § 17 comment *g*. Persons who are forced to leave their homes and travel to other jurisdictions for reasons of health can become domiciled at their new abodes. *See* Note, *supra*, 13 U.Pitt.L.Rev. at 704.

■ Students or teachers who are required to live in a particular jurisdiction because of the location of the institution in which they are enrolled or employed can establish domiciles within that jurisdiction.[2] *See* Johnston v. Cordell National Bank, 421 F.2d 1310 (10th Cir. 1970); Milliken v. Tri-County Electric Cooperative, Inc., 254 F.Supp. 302 (D.S.C.1966); Wehrle v. Brooks, 269 F.Supp. 785 (W.D.N.C.1966), aff'd, 379 F.2d 288 (4th Cir. 1967). In Krasnov v. Dinan, 333 F.Supp. 751 (E.D.Pa.1971), on rehearing, 339 F.Supp. 1357 (E.D. Pa.1972), the court held that defendant was a citizen of Pennsylvania for purposes of diversity of citizenship even though he was in Pennsylvania because he was a member of a semi-monastic order that assigned him to teach in that state. In so holding, the court rejected arguments that defendant had moved to the state "only because directed to do so by his superiors" and that "he did not intend to live in Pennsylvania permanently, but only until he was reassigned elsewhere." 333 F.Supp. at 753.

■ Many political subdivisions have ordinances requiring police officers and other municipal employees to reside within the city limits. *See* Detroit Police Officers Association v. City of Detroit, 385 Mich. 519, 190 N.W.2d 97 (1971), appeal dismissed, 405 U.S. 950,

2. As with servicemen, *see* Carrington v. Rash, 380 U.S. 89, 85 S.Ct. 775, 13 L.Ed. 2d 675 (1965), the determination of a student's domicile can be affected by the fundamental nature of the right being asserted, such as the right to vote. *See* Wilkins v. Ann Arbor City Clerk, 385 Mich. 670, 189 N.W.2d 423 (1971); *see generally*, Anno., 37 A.L.R. 138 (1925).

92 S.Ct. 1173, 31 L.Ed.2d 227 (1972). Can it be doubted that municipal police officers may establish domiciles within the cities where they must live?[3]

■ The foregoing examples warrant two observations. First, the bare fact that a person has been "compelled" to relocate within a particular jurisdiction does not ordinarily prevent him from becoming domiciled therein, although courts are justifiably concerned with substantiating declared intentions. Second, persons are "compelled" to relocate by a variety of circumstances, ranging from pursuit of employment to therapeutic dictates for illness; from the desire to attend educational or vocational institutions to the demands of the sovereign. Although these forces may differ in kind, they often equate in degree, and yet the law in this area has developed along the lines of *per se* rules tailored to the type of compulsion being exerted rather than in the direction of varying standards of proof directly with the strength of the constraints upon individual freedom of action.

■ We believe that the prisoner, like the serviceman or the Cabinet official, should not be precluded from showing that he has developed the intention to be domiciled at the place to which he has been forced to remove. No good reason appears for applying a contrary *per se* rule to him by making the presumption that he has retained his former domicile an irrebuttable one.

■ In addition, whatever may be the rule ordinarily applied in resolving problems of conflicts of law, we decline to adopt a *per se* principle in defining "citizenship" for purposes of federal jurisdiction.[4] We ought to be hesitant to define a cognizable class of citizens out of access to the federal courts, which

---

3. In fact, the Detroit ordinance requires that the employees be actually *domiciled* within the city, as contrasted with mere nominal residence. *See* Detroit Police Officers Ass'n v. City of Detroit, 385 Mich. 519, 525–526, 190 N.W.2d 97 (1971), appeal dismissed, 405 U.S. 950, 92 S.Ct. 1173, 31 L.Ed.2d 227 (1972).

4. Development of the law of "citizenship" for federal diversity purposes has proceeded largely on the assumption that domicile is a unitary concept, meaning the same thing in all contexts. Perhaps the classic statement is that of Justice Holmes: "The very meaning of domicil is the technically pre-eminent headquarters that every person is compelled to have in order that certain rights and duties that have been attached to it by the law may be determined. . . . In its nature it is one, and if in any case two are recognized for different purposes, it is a doubtful anomaly." Williamson v. Osenton, 232 U.S. 619, 625, 34 S.Ct. 442, 443, 58 L.Ed. 758 (1914). Eleven years later, Professor Walter Wheeler Cook took issue with that proposition during the debates of the American Law Institute on the adoption of the first Restatement on the conflict of laws. He argued: "There is no doubt that what you might call the core of the concept is the same in all these situations; but as you get out towards what I like to call the twilight zone of the subject, I don't be-

lieve the scope remains exactly the same for all purposes." 3 Proceedings of the American Law Institute 227 (1925). This position was rejected by the first Restatement (*see* Restatement (First) of the Conflict of Laws § 11 (1934)), and it evoked the indignant response of Professor Joseph Beale that to adopt it would ignore 150 years of legal history in which courts had been applying domicile as a single concept by citing cases from different contexts interchangeably in formulating general rules. *See* 1 J. Beale, The Conflict of Laws § 9.4, at 92–94 (1935).

However, the argument that domicile is not a unitary concept, that its elements vary according to the nature of the rights being adjudicated, that it is applied in a flexible manner so that courts can reach equitable results (e. g., by varying the quantum of evidence required or by drawing different inferences from identical facts) has gained scholarly support over the years since Cook's statement. *See* Currie, The Federal Courts and the American Law Institute (pt. 1), 36 U.Chi. L.Rev. 1, 12 n. 61 (1968); Reese, Does Domicil Bear a Single Meaning?, 55 Colum.L.Rev. 589 (1955); Weintraub, An Inquiry into the Utility of "Domicile" as a Concept in Conflicts Analysis, 63 Mich.L.Rev. 961, 983–986 (1965); Note, Evidentiary Factors in the Determination of Domicile, 61 Harv.L.Rev. 1232, 1233–

are, after all, the courts of the sovereign to which that class of citizens belongs. *Cf.* Moore & Weckstein, Diversity Jurisdiction: Past, Present, and Future, 43 Texas L.Rev. 1, 19 (1964). We ought further to hesitate to raise the spectre of unconstitutionality by approving the application of an irrebutable presumption of fact to a particular class of citizens. *Cf.* Carrington v. Rash, 380 U.S. 89, 85 S.Ct. 775, 13 L.Ed.2d 675 (1965); Kelm v. Carlson, 473 F.2d 1267 (6 Cir. 1973).

Finally, it is interesting to observe that the facts of this case provide a rather unique twist to the reason most often given for the inclusion of diversity jurisdiction in the Constitution: the fear of local prejudice against out-of-state residents. *See, e. g.,* Moore & Weckstein, *supra,* 43 Texas L.Rev. at 15–16; Warren, New Light on the History of the Federal Judiciary Act of 1789, 37 Harv.L.Rev. 49, 83 (1923); C. Wright, *supra,* § 23 at 73.[5] Assuming

1234 (1948); Comment, Necessity for a Continued Residence in Acquisition of a Domicile, 37 Yale L.J. 649 (1928). *But cf.* McClean, The Meaning of Residence, 11 Int. & Comp.L.Q. 1153 (1962). It should be observed that this argument attempts to describe what courts do, not what courts say, because courts ordinarily will pay lip-service to standard rules even while they strain and distort the rules to reach sound results. *See* Comment, Domicile of Choice-Fixed Rules, 36 Yale L.J. 408, 412 (1927). Nevertheless, occasional judicial expressions of doubt about the utility of the unitary-concept theory can be found. *See* Williams v. North Carolina, 325 U.S. 226, 244, 65 S.Ct. 1092, 89 L.Ed. 1577 (1945) (Rutledge, J., dissenting); Ziady v. Curley, 396 F.2d 873, 876 (4th Cir. 1968); Woolridge v. McKenna, 8 F. 650, 683 (C.C.W.D.Tenn.1881); In re Estate of Jones, 192 Iowa 78, 82, 182 N.W. 227 (1921).

Professor Currie is unhappy with the equation of domicile with state citizenship for purposes of diversity jurisdiction because it is difficult to determine and because "it too frequently bears no relation to the probability of bias." Currie, *supra,* 36 U.Chi.L.Rev. at 10. He advocates that federal courts focus more on physical facts rather than on a probably unknown domiciliary intention, and he contends that the traditional tests of domicile, because they were not formulated with diversity jurisdiction in mind, should not be taken as determinative. *Id.* at 11–12 & n. 61. To an extent, this argument ignores the fact that, except when precluded by the operation of some *per se* rule of law, *see, e. g.,* Seegers v. Strzempek, 149 F.Supp. 35 (E.D.Mich.1957), courts usually will examine the physical facts in an effort to ascertain domiciliary intent, and will often assign a domicile on the basis of what appears to be the choice of a

home rather than accept at face value declarations of intention. *See* Levitt, Recent Domicil Cases, 20 Ill.L.Rev. 134, 138–140 (1925). To the extent that he is arguing that federal courts are not bound by the traditional fixed rules of conflicts of law in the context of resolving federal jurisdictional questions, and that it is unfortunate to attach a blanket equivalence to areas of the law that may intersect in only one particular—the notion of attachment to a single locale—his objections can be met by rejecting the unitary-concept rule and weighing in each case the policies underlying the question at issue and adapting the rules or evaluating the evidence in accordance with those policies. *See* Ziady v. Curley, *supra;* Woolridge v. McKenna, *supra;* Williams v. Williams, 328 F.Supp. 1380, 1382–1384 (D. Virgin Islands 1971); Pannill v. Roanoke Times Co., 252 F. 910, 914–915 (W.D.Va.1918); Reese, *supra.*

5. As Chief Justice Marshall put it:
   However true the fact may be, that the tribunals of the States will administer justice as impartially as those of the nation, to parties of every description, it is not less true, that the constitution itself either entertains apprehensions on this subject, or views with such indulgence the possible fears and apprehensions of suitors, that it has established national tribunals for the decision of controversies between aliens and a citizen, or between citizens of different States.

   Bank of the United States v. Deveaux, 5 Cranch (9 U.S.) 61, 87, 3 L.Ed. 38 (1809). *See also* Lankford v. Platte Iron Works Company, 235 U.S. 461, 478, 35 S.Ct. 173, 59 L.Ed. 316 (1915) (Pitney, J., dissenting); Scott v. Sandford, 19 How. (60 U.S.) 393, 580, 15 L.Ed. 691 (1857) (Curtis, J., dissenting); Dodge v. Woolsey, 18 How. (59 U.S.) 331, 354, 15 L.Ed. 401 (1856).

the accuracy of this explanation,[6] determination of the citizenship of a party for purposes of federal diversity jurisdiction should emphasize the physical facts of the party's situation that could tend to result in local prejudice. *See* Currie, The Federal Courts and the American Law Institute (pt. 1), 36 U. Chi.L.Rev. 1, 11–12 (1968). Appellant, as we have pointed out, was known as a model young man in his community prior to his well-publicized conviction for the commission of a heinous crime. He has asserted that he will never return to his former community because of the scorn and obloquy to which he would be subject, and there is every reason to agree with his prediction in this respect. Should appellant not have the assurance that his suit for damages against his parents and his attorney would not be infected by the same feeling of outrage that he anticipates will prevent him from ever assuming residence at his erstwhile home? Federal courts should be alert to vindicate this type of interest in recognition of one of the traditional justifications for their existence.

## II

■ The other possible rationale for denying a federal prisoner the opportunity to establish his citizenship in the state of his incarceration for purposes of diversity jurisdiction, which the District Court did not reach, can be quickly disposed of. We cannot find any federal statute or common-law rule to the effect that conviction and imprisonment destroys a citizen's right to invoke the diversity jurisdiction of the federal courts. In fact, whatever may be the viability of the "civil death" concept as it relates to the loss of fundamental rights by persons imprisoned for crime, *see, e. g.,* Goosby v. Osser, 409 U.S. 512, 93 S.Ct. 854, 35 L.Ed.2d 36 (1973); Nolan v. Fitzpatrick, 451 F.2d 545 (1st Cir. 1971); *cf.* Carrington v. Rash, *supra;* the loss of the right to invoke the diversi-

ty jurisdiction of federal courts is not a collateral punishment of incarceration. *See* Ames v. Keuhnle, 425 F.2d 224 (5th Cir. 1970); White v. Fawcett Publications, 324 F.Supp. 403 (W.D.Mo.1970); 1 J. Moore, *supra,* ¶ 0.74 [6.–5], at 708.-65. We have no occasion to decide at this time whether appellant would have the capacity, under Pennsylvania law, to sue, *see* Fed.R.Civ.P. 17(b); Urbano v. News Syndicate Co., 358 F.2d 145 (2d Cir. 1966), cert. denied, 385 U.S. 831, 87 S.Ct. 68, 17 L.Ed.2d 66 (1966); 1 J. Moore, *supra,* ¶ 0.74 [6.–5], at 708.65 & n. 7; 3A *id.* ¶ 17.16; 3B *id.* ¶ 25.06 [3], at n. 1, or whether, under Ohio law, he would have an enforceable remedy. *See* Angel v. Bullington, 330 U.S. 183, 67 S. Ct. 657, 91 L.Ed. 832 (1947); 3A J. Moore, *supra,* ¶ 17.16, at 653–54; 3B *id.* ¶ 25.06 [3], at n. 1.

■ We hold that a litigant will not be precluded from establishing a domicile within a state for purposes of federal diversity jurisdiction solely because his presence there initially resulted from circumstances beyond his control. We recognize the importance of considering physical or legal compulsion in determining whether domicile is gained or lost, but we limit the application of involuntary presence to its operation as a presumption ordinarily requiring more than unsubstantiated declarations to rebut.

■■ Accordingly, we reverse the judgment of the District Court and we remand for further proceedings. Appellant has the burden of proving Pennsylvania citizenship, and the District Court may decide the question upon affidavits or, if required, in a full evidentiary hearing, with or without a jury, in his discretion. *See* 1 J. Moore, *supra,* ¶ 0.74 [1], at 707.3–.5. In making this essentially factual determination, the court should accord weight to appellant's declarations of intentions, but in the circumstances of this case the physical facts pertaining to appellant's incarceration and to the conduct of his personal affairs assume

6. *But see* Friendly, The Historic Basis of Diversity Jurisdiction, 41 Harv.L.Rev. 483, 492–499 (1928).

perhaps a greater than usual significance because appellant's statements of intention cannot bear on the fact of his initial relocation to Pennsylvania. The court should consider factors such as the possibility of parole for appellant,[7] the manner in which appellant has ordered his personal and business transactions, and any other factors that are relevant to corroboration of appellant's statements.[8] These factors must be weighed along with the policies and purposes underlying federal diversity jurisdiction to determine whether appellant has overcome the presumption that he has maintained his former domicile.

Reversed and remanded.

EDWARDS, Circuit Judge (concurring).

The legal problems of this case are complex, but the practical problems may prove to be even more formidable. This case could trigger a quantity of frivolous litigation in the federal courts motivated by the natural desire of prisoners for a trip home to testify, even if the trip has to be under guard.

As the opinion of the court points out, for many years courts have followed the rule that persons (including federal prisoners) removed from their state of domicile by legal orders do not thereby lose their previous domicile. Cohen v. United States, 297 F.2d 760 (9th Cir. 1962); American Surety Co. of New York v. Cosgrove, 40 Misc. 262, 81 N.Y. S. 945 (1903); Metropolitan Life Ins. Co. v. Jones, 192 Ark. 1145, 97 S.W.2d 64, 66 (1936); United States v. Gronich,

211 F. 548 (W.D.Wash.1914); Neuberger v. United States, 13 F.2d 541, 542–543 (2d Cir. 1926). In general, this rule serves to protect the legal rights of prisoners.

The corollary to the rule that imprisonment in another state did not occasion a change of domicile was, however, that during a prisoner's incarceration outside of his home state, as a matter of law he could not, even if he desired to, effect a change of domicile because his presence in the state of imprisonment was deemed coerced rather than voluntary. United States v. Stabler, 169 F.2d 995 (3d Cir. 1948); Shaffer v. Tepper, 127 F.Supp. 892 (C.D.Ky.1955); Restatement (Second) of Conflict of Laws § 17 (1971).

The opinion of the court in this case rejects the application of the rule just stated above as an absolute and irrebuttable presumption, and I concur. But I also feel that the rule should properly be characterized as a strong presumption capable of being overturned only by allegation and proof of change (or changes) of material circumstances bearing on domicile. I read the court's opinion as agreeing.

The two fundamental considerations in establishing domicile for purposes of state citizenship are residence in the state and intention to remain there permanently. Napletana v. Hillsdale College, 385 F.2d 871 (6th Cir. 1967). Both of these factors are usually subject to proof by objective facts. In the case of a federal prisoner in an out-of-state prison, however, his compelled presence

---

7. The fact that he is serving a life sentence, of course, lends a great deal of credibility to his assertion that he will never return to Ohio.

8. Considerations ordinarily relevant to determination of domiciliary intent are discussed in 1 J. Beale, The Conflict of Laws §§ 41A–41D (1935); Beale, Proof of Domicile, 74 U.Pa.L.Rev. 552 (1926); Currie, The Federal Courts and the American Law Institute (pt. 1), 36 U. Chi.L.Rev. 1, 11–12 (1968); Heilman,

Domicil and Specific Intent, 35 W.Va.L.Q. 262 (1929); Levitt, Recent Domicil Cases, 20 Ill.L.Rev. 134 (1925); 1 J. Moore, Federal Practice ¶ 0.74[3.–3] (2d ed. 1948); Note, Evidentiary Factors in the Determination of Domicile, 61 Harv. L.Rev. 1232 (1948); Note, Self-Serving Declarations and Acts in Determination of Domicile, 34 Geo.L.J. 220 (1946); Comment, Necessity for a Continued Residence in Acquisition of a Domicile, 37 Yale L.J. 649 (1928); Comment, Domicil of Choice —Fixed Rules, 36 Yale L.J. 408 (1927).

is certainly not identical with "residence" in its normal usage. And a declaration of intent to remain in the state concerned is greatly weakened (particularly for a person serving a life term) by the obvious lack of choice. The only proofs which come quickly to mind which a federal prisoner might substitute for the usually available objective proofs of domicile would be the establishment of an apparently permanent residence in the state of imprisonment by the prisoner's immediate family. *See* Metropolitan Life Insurance Co. v. Jones, *supra.*

Accepting (as I do) the proposition in the court's opinion that domicile is generally a question of fact for the trial judge, the great majority of domicile questions posed by federal prisoner diversity cases should be amenable to resolution by affidavits filed on motion for summary judgment without the expense and risk of cross-country prisoner travel under guard.